[No. S020515. Aug. 13, 1992.]

GEORGE NEARY, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Appellants.

## COUNSEL

Keker & Brockett, John W. Keker and David J. Meadows for Plaintiff and Appellant.

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., Steven L. Mayer, Richard A. Marcantonio, Ramsey, Morrison, Wallis & Abramson and O. J. Ramsey, Jr., for Defendants and Appellants.

Morrison & Foerster, James J. Brosnahan, Grant L. Kim, Marc N. Bernstein, Mark W. Danis, Wright, Robinson, McCammon, Osthimer & Tatum, James C. Nielson, Barnum, Balthazar & De Lara, Christine Balthazar, Carroll, Burdick & McDonough, Donald T. Ramsy, Rodney L. Eshelman and David M. Rice as Amici Curiae.

## OPINION

**BAXTER, J.**—While this appeal was pending in the Court of Appeal, the parties agreed to settle their dispute and jointly requested the Court of Appeal to reverse the trial court's judgment in plaintiff's favor. The Court of Appeal declined to do so. The issue is whether a Court of Appeal should grant a stipulated request by all parties pending appeal to set aside a trial court judgment in order to effectuate the parties' agreement to settle their dispute and terminate further litigation. We hold that as a general rule parties are entitled to a stipulated reversal by the Court of Appeal absent a showing of extraordinary circumstances that warrant an exception. No such circumstances are present in this case, and we therefore reverse the judgment of the Court of Appeal.

### FACTS

Plaintiff George Neary, a cattle rancher, obtained a jury verdict of $7 million in a libel action against the Regents of the University of California

and three veterinarians employed by the University of California at Davis in its School of Veterinary Medicine (hereafter the University). The action arose from the University's publication of a report asserting that Neary had engaged in deficient ranch management practices that caused illness and death of many of Neary's cattle. Neary contended the cattle had been poisoned by a pesticide sprayed by governmental agencies to control an infestation of scabies mites.

Defendants appealed, and Neary cross-appealed. While the appeals were pending, the parties agreed to settle. Defendants would pay Neary $3 million, and, in return, he joined with all defendants in a stipulation providing that the appeals would be dismissed with prejudice, the Court of Appeal would vacate the trial court's judgment, and the action in the trial court would then be dismissed. Pursuant to this stipulation, the parties filed a joint application in the Court of Appeal asking it to reverse the trial court's judgment and remand the case to the trial court for dismissal with prejudice. The Court of Appeal rejected the request.

## DISCUSSION

### I. *Appellate courts' authority*

The threshold issue of whether an appellate court has the authority to reverse a trial court judgment to effectuate the parties' settlement of their dispute need not long detain us. Indeed, even though the Court of Appeal in this case declined the parties' request, the court did not conclude that it lacked *the authority* to grant the request. (Of course, the parties in this case, who are seeking the stipulated reversal, also agree that the appellate courts have this authority.) Likewise, we are aware of no provision in our state's Constitution or statutes that denies appellate courts the authority to reverse a judgment in order to effectuate a settlement and terminate further litigation.

Conversely, it is well established that California's Constitution provides the courts, including the Courts of Appeal, with inherent powers to control judicial proceedings. (Cal. Const., art. VI, § 1; *Walker v. Superior Court* (1991) 53 Cal.3d 257, 266-267 [279 Cal.Rptr. 576, 807 P.2d 418]; *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 600 [297 P.2d 967].) To the same effect, Code of Civil Procedure section 128, subdivision (a)(8) authorizes every court "[t]o amend and control its process and orders so as to make them conform to law and justice." This provision is consistent with and codifies the courts' traditional and inherent judicial power to do whatever is necessary and appropriate, in the absence of controlling legislation, to ensure the prompt, fair, and orderly administration of justice. The orderly termination of litigation the parties themselves no longer wish to pursue has a direct

and substantial effect on the use and conservation of the appellate court's resources and is therefore a matter within the courts' inherent power to control their own processes. Moreover, when the parties themselves no longer wish to litigate, a stipulated reversal is consistent with the courts' authority to conform their orders with justice. (Code Civ. Proc., § 128, subd. (a)(8).) We hold that California's appellate courts have the legal authority to reverse (or otherwise vacate) a trial court's judgment when the parties stipulate to such action as a condition of a proposed settlement pending appeal.

## II. *The correct presumption in favor of settlement*

 We further conclude that, as a general rule, the parties should be entitled to a stipulated reversal to effectuate settlement absent a showing of extraordinary circumstances that warrant an exception to this general rule. This presumption in favor of a stipulated reversal is sound and salutary for several reasons. The facts of this case in particular demonstrate why the settlement should be effectuated pursuant to the parties' terms, including their request for a stipulated reversal.

### A. *The efficiency of postjudgment settlements*

This court recognized a century ago that settlement agreements " 'are highly favored as productive of peace and good will in the community,' " as well as " 'reducing the expense and persistency of litigation.' " (*McClure* v. *McClure* (1893) 100 Cal. 339, 343 [34 P. 822].) The need for settlements is greater than ever before. "Without them our system of civil adjudication would quickly break down." (Lynch, California Negotiation and Settlement Handbook (1991), p. vii [foreword by California Supreme Court Chief Justice Malcolm M. Lucas].) Settlement is perhaps most efficient the earlier the settlement comes in the litigation continuum. The benefits of settlement, however, do not evaporate when judgment is entered.

A pretrial settlement does, of course, avoid the costs of trial. That much is a truism. It is also an incomplete assessment because it views the litigation process only with hindsight. The matter must also be viewed prospectively. Although a postjudgment settlement is perhaps less efficient than a pretrial one, equally true is that a postjudgment settlement is nonetheless efficient in its own right because it will preclude the need for *future* expenditures of time and money by the parties and the judiciary. Requiring parties to continue to litigate a matter over which there is no longer a real dispute "is wasteful of the resources of the judiciary." (*Federal Data Corp.* v. *SMS Data Products Group* (Fed. Cir. 1987) 819 F.2d 277, 280 [directing administrative agency to vacate decision after parties settled].) Our appellate courts' own policies

demonstrate this point. In 1985, one-half of the Courts of Appeal had no settlement program, either formal or informal. (Cal. Civil Appellate Practice (2d ed., Cont.Ed.Bar 1985) § 11.1, p. 329.) Four years later, settlement conference procedures were in place in every Court of Appeal with two exceptions. (Eisenberg, Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group) ¶ 6:2, p. 6-1.) At present, *every* Court of Appeal provides for settlement conferences, reflecting the now uniform recognition that the policy favoring settlement continues after judgment. Even more telling is the fact that Courts of Appeal throughout the state, including the Court of Appeal in this case, have routinely granted the parties' requests for stipulated reversals and similar procedures to effectuate settlement agreements. The principle that even a belated settlement saves resources is also well recognized in the federal courts. (*Federal Data Corp. v. SMS Data Products Group, supra*, 819 F.2d 277, 280; *Nestle Co., Inc. v. Chester's Market, Inc.* (2d Cir. 1985) 756 F.2d 280, 282-283.) Indeed, "the Supreme Court has summarily vacated judgments in cases settled while pending on appeal after a court of appeals has refused to do so." (*Nestle Co. Inc. v. Chester's Market Inc., supra*, 756 F.2d at p. 282, citing *New Left Ed. Proj. v. Board of Reg. of the U. of Tex. Sys.* (5th Cir. 1973) 472 F.2d 218, vacated 414 U.S. 807 [38 L.Ed.2d 43, 94 S.Ct. 118].)

The policy in favor of settlement, even when it requires a stipulated reversal, is rooted in practicality. If settlement on appeal is prohibited, the appeal must be heard and decided. If the judgment is reversed and retrial is allowed (not an unusual result), considerable future expense and trial court resources will be consumed. The present case is an excellent example of the merit of postjudgment settlements. The Court of Appeal's refusal to implement the parties' agreement would have the following consequences:

(1) The Court of Appeal would expend substantial resources in deciding the merits of the underlying appeal. The trial lasted four *months*. The record consists of 63 volumes of reporter's transcript containing nearly 13,000 pages and a 19-volume clerk's transcript of 5,366 pages. The action has been the subject of a prior appeal. (*Neary v. Regents of the University of California* (1986) 185 Cal.App.3d 1136 [230 Cal.Rptr. 281].) When settlement was reached during the present appeal, the Court of Appeal had already granted three defendants' requests to file a brief twice as long as the normal maximum. The appellate courts have enough to do without deciding cases the parties no longer wish to litigate.

(2) The parties would incur substantial costs in litigating this appeal, e.g., filing and responding to a brief twice the normal length. If the judgment were reversed and there were a retrial, the parties and the trial court would expend substantial further resources, as demonstrated by the length of the

first trial. The parties also have made clear that, if the merits of the appeal were decided, the loser would surely seek relief in this court and perhaps the United States Supreme Court. In view of the sharpness of the dispute to date, the amount at stake, and the complex issues raised (some of them constitutional), further appeals would be a near certainty. This would burden the courts as well as the parties.

We reject the notion, advanced by some of the amici curiae in this case, that the possibility of postjudgment settlements incorporating a stipulated reversal will reduce the frequency of pretrial settlements. This view misses the mark in several respects. First, the law review article on which the amici curiae rely claims that "the availability of vacatur [i.e., reversal] makes going to trial cost-free, apart from litigation costs." (Fisch, *Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur* (1991) 76 Cornell L.Rev. 589, 596, fns. omitted.) This is rather like saying that death is only temporary, apart from its permanency. Litigation costs are an enormous burden and are such an integral part of the process that they cannot be simply severed from the equation. Indeed, the article's author acknowledges in a footnote that these costs can be considerable, but the article fails to consider their significance.

Second, trials (indeed, the entire litigation process) have significant *non-*monetary costs. One of the most significant is negative publicity, which can be especially harmful to an institutional defendant, e.g., a product manufacturer. In amici curiae's view, such a defendant loses nothing if he settles after an unfavorable judgment. Not so. Negative news reports can have a lasting effect. Individuals also suffer considerable emotional distress during litigation. These costs may be unrecoverable.

Third, the argument against stipulated reversal too easily surmises that a losing defendant can simply "buy its way out" from an unfavorable judgment by paying the amount of the judgment. This is dubious because it assumes a case can be settled after trial for the same amount as it could have been settled before trial. As practitioners know, however, the parties' respective pretrial evaluations of a case change markedly after trial. (This is true regardless of whether stipulated reversal is an issue, e.g., in the situation where a settlement comes after trial but before judgment.)

Fourth, even if the amici curiae's view had some intuitive appeal, it would not be supported by empirical data. To the contrary, the record in this case (more specifically, the parties' joint request for judicial notice) demonstrates that Courts of Appeal have heretofore routinely granted stipulated reversals and similar procedural methods for effecting settlements. Nothing suggests,

however, that the availability of such a procedure has even slightly decreased the number of pretrial settlements.

In short, the use of a stipulated reversal to effectuate a postjudgment settlement is an efficient and conservative use of the resources of the courts and the litigants.

### B. *Fairness to the parties*

Simple fairness requires that the first and most weighty consideration be given to the parties' interests and that they be accommodated except in the extraordinary case. The parties are the persons (or entities) most affected by a judgment, which is the ultimate product of their sustained effort and expense. (*Federal Data Corp.* v. *SMS Data Products Group*, *supra*, 819 F.2d 277, 280 [noting need for fairness to parties].) Homilies about "judicial integrity" and "legal truth" will ring hollow in the ears of the parties. The courts exist for litigants. Litigants do not exist for courts.

In ordinary civil actions such as the one before us, the parties come to court seeking resolution of a dispute between them. The litigation process they encounter is fraught with complexities, uncertainties, delays, and risks of many kinds. Different judges and juries may respond in different ways to the same evidence and argument. Public judicial proceedings may result in adverse publicity and unwanted disclosure of previously confidential information. Damage awards (or failure to recover) may cause financial hardship or ruin. These observations are not original. "More than a century ago, Abraham Lincoln gave the following advice: 'Discourage litigation. Persuade your neighbors to compromise wherever you can. Point out to them how the nominal winner is often a real loser—in fees, expenses, and waste of time.' This was sage advice then and remains so now." (Lynch, California Negotiation and Settlement Handbook, *supra*, p. vii (foreword by California Supreme Court Chief Justice Malcolm M. Lucas).) When in the course of these perilous proceedings the parties who brought the dispute to court decide to eliminate these hazards by a voluntary agreement to terminate the litigation, the courts should respect the parties' choice and assist them in settlement.

The present case is again a prime example of why the parties should be accommodated. As reflected by the complexity of the underlying defamation action, the parties will incur substantial costs on appeal and, if necessary, on retrial. Aside from continued legal costs, the parties will suffer continuing psychological burdens. "Litigants usually find litigation to be not merely a distracting 'waste of time,'" but rather "intensely aggravating." (James &

Hazard, Civil Procedure (3d ed. 1985) § 6.3, p. 286.) The defendant veterinarians in this case plausibly assert a desire for nothing more than to put this case behind them. Plaintiff Neary, now in his advanced years, also makes clear that he wants his recovery. His plea is sympathetic: "Neary has spent more than twelve years in an expensive, time-consuming, emotionally wrenching, and destructively distracting struggle which has included enough twists, turns, setbacks and victories for a novel. He has finally resolved that struggle through negotiation and voluntary agreement." Thwarting the settlement would frustrate the parties' mutual desire for an immediate end to their now 13-year-old dispute. The parties have pummeled each other long enough and have staggered to their respective corners. We choose to give them help, not the prospect of further battering.

### C. *The need to avoid arbitrary distinctions*

The Court of Appeal's notion that a postjudgment settlement results in a waste of the time and expense of trial incorrectly assumes that a postjudgment settlement necessarily comes after a trial. In a civil case, judgment may be entered before trial, for example, on a defendant's successful demurrer or motion for summary judgment. In those cases, a postjudgment settlement does not mean trial was wasted. There was no trial. The reality in those cases is that judgment is not the result of substantial court resources. The amount of court time does not even compare to that of a trial. The Court of Appeal, however, treated all postjudgment settlements as being equally wasteful.

The Court of Appeal's reliance on resources already consumed is flawed in another respect. Even after protracted and costly litigation, cases are commonly settled on the eve of trial or even well after trial has begun. Trial courts do not preclude such settlement on the ground that too much has already been invested in the litigation. Drawing a line at the entry of judgment is thus arbitrary. We might just as well draw the line at any point after a specified number of hours or dollars have been expended by the parties or the trial court.

### D. *Integrity of the judicial process*

The Court of Appeal opined that stipulated reversal "would trivialize the work of the trial courts and undermine the integrity of the entire judicial process." This conclusion is based on the Court of Appeal's faulty premise that litigation is a search for "legal truth," not "simply a dispositional act." This puts the abstract cart before the practical horse. ██ ██ The primary purpose of the public judiciary is "to afford a forum for the settlement of litigable matters between disputing parties." (*Vecki* v. *Sorensen* (1959) 171

Cal.App.2d 390, 393 [340 P.2d 1020].) We do not resolve abstract legal issues, even when requested to do so. We resolve real disputes between real people. (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306].) This function does not undermine our integrity or demean our function. By providing a forum for the peaceful resolution of citizens' disputes, we provide a cornerstone for ordered liberty in a democratic society.

The Court of Appeal's concern for the integrity of trial court judgments is flawed in other respects. First, the notion that such a judgment is a statement of "legal truth" places too much emphasis on the *result* of litigation rather than its *purpose*. "In all civil litigation, the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, or the termination of some conduct. Redress is sought *through* the court, but *from* the defendant. . . . The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" (*Hewitt* v. *Helms* (1987) 482 U.S. 755, 761 [96 L.Ed.2d 654, 661, 107 S.Ct. 2672], original italics.)

Second, the Court of Appeal decision incorrectly suggests that a trial court judgment provides guidance to other courts and litigants. Not so. ■ "[T]rial courts make no binding precedents." (*Fenske* v. *Board of Administration* (1980) 103 Cal.App.3d 590, 596 [163 Cal.Rptr. 182]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 763, p. 730.)

■ Third, a stipulated reversal does not trivialize or render meaningless a trial court's work. As explained above, the paramount purpose of litigation is to resolve disputes. If that goal is achieved, even after judgment, the trial court's essential function has been fulfilled.

Fourth, a trial, like a settlement conference, may educate the litigants as to the true value of the case and prompt a settlement. If so, the case has been resolved, and the trial was not wasted. Resolution—whether decreed or agreed—is the ultimate object of the litigation process.

Finally, a stipulated reversal is not an attempt to erase or rewrite the record of a trial. Everything that has happened to date in this litigation—including the jury verdict against defendants—is and will remain a matter of public record, even after a stipulated reversal. No one is proposing that the record in this case be destroyed or sealed. The record will reflect that the

reversal was pursuant to a settlement and stipulation. There will be no inference that the jury or trial court erred. Whatever conclusions the public wishes to draw from the litigation can still be drawn after the reversal. To remove any possible doubt in a case of a stipulated reversal, the appellate court can explicitly state in its order that the reversal is pursuant to settlement and does not constitute either approval or rejection of the trial court's judgment.

### E. *The public interest*

The trial court judgment requires the University—a public entity—and its employees to pay $7 million to plaintiff. Under the proposed settlement, defendants would pay only $3 million—approximately one-third of the judgment amount and accrued interest. A savings of more than $4 million of real money weighs more heavily in favor of the public interest than some abstract notion that the public needs this judgment to stand as a testament to plaintiff's victory—a victory that plaintiff himself is willing to forgo in large part. If the settlement in this case is not effectuated, both California taxpayers and public revenue recipients would ultimately lose $4 million for no apparent reason if the judgment were affirmed on appeal. This stands the public interest on its head and would surely seem unfair to those citizens denied essential services as a result. The public interest in this case weighs heavily in favor of the settlement and stipulated reversal.

Some of the amici curiae in this case contend a stipulated reversal should be denied when it would adversely affect the public interest. As an abstract matter, this conclusion cannot be rejected out of hand. There might be unusual circumstances in which the public interest would weigh dispositively against a stipulated reversal. We caution, however, that the strong presumption in favor of allowing stipulated reversals is not rebutted by some amorphous and speculative public interest. The litigants' interests in support of a stipulated reversal are substantial and immediate—terminating a dispute, saving legal expenses and resuming more productive activity. The courts' interest in disposing of unnecessary litigation, i.e., where the parties have settled their dispute, is also substantial. In most cases, however, the public interests asserted against a stipulated reversal will likely be indirect and perhaps even illusory, as with the contention in this case that the integrity of the trial court judgment will be impugned. Moreover, the public interest itself is served by the peaceful settlement of disputes and unclogging of court dockets. To be sufficient to overcome the strong presumption in favor of allowing stipulated reversals, an asserted public interest must be specific, demonstrable, well established, and compelling. No such public interest is present in this case.

### F. *Potential collateral estoppel*

Amici curiae in this case also contend a stipulated reversal should be denied whenever a judgment might give rise to collateral estoppel in a future action. Even the Court of Appeal, although it rejected the stipulation, did not rely on this factor. The reason is apparent. The parties in this case agree that no nonparty is or will be affected by the trial court judgment, and nothing in the record suggests otherwise. Collateral estoppel is not an issue in this case. We therefore need not decide, and do not decide, whether potential collateral estoppel should be a factor in deciding whether to depart from the strong presumption in favor of allowing the parties to settle their dispute by seeking a stipulated reversal. ■ The well-established rule is that we should avoid advisory opinions. (*Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300].)

### G. *Summary as to the presumption favoring stipulated reversal*

■ We hold that, when the parties to an action agree to settle their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule. Any determination that such circumstances exist must be made on a case-by-case basis. Because we can only speculate as to the facts of future cases, we cannot enumerate with any specificity what facts may or may not constitute an extraordinary circumstance that would warrant denying the parties' request. We emphasize, however, that the policies favoring settlement are strong and that the extraordinary-circumstance exception is narrow.

A presumption in favor of stipulated reversal to effectuate settlement, rather than a presumption against the procedure, is also more efficient in terms of the resources required of an appellate court. Under a negative presumption, the parties would have the burden of showing that their stipulation should be granted because no countervailing factors are present, e.g., a contrary public interest. Presumably they would have to meet this burden by submitting memoranda of points and authorities and supporting declarations and documentary evidence. Trying to prove a negative, i.e, that there is no reason why the reversal should not be granted, is, of course, difficult. Moreover, the appellate court would have to fully consider these materials. This is largely unnecessary. Under a presumption in favor of granting the parties' request for reversal, the court need not expend significant resources unless a nonparty comes forward and objects to the settlement for some reason or unless some problem is apparent in the record.

### III. *Applying the presumption favoring stipulated reversal to this case*

The facts of this case point to only one reasonable result—granting the stipulated reversal. Even in the absence of the general presumption favoring this procedure, the factors we have discussed above would lead to the same conclusion: (1) a postjudgment settlement will conserve substantial resources of the parties and the courts; (2) the parties will be given the paramount consideration to which they are entitled and will be treated fairly; (3) the integrity of the judicial process will be maintained, indeed enhanced by facilitating an efficient and fair settlement; and (4) the public interest will be served by a savings of approximately $4 million. Conversely, the record reflects no extraordinary circumstances that weigh against allowing the stipulated reversal. We reject as being insubstantial the notion that the stipulated reversal must be denied on the ground that the public has an interest in having the trial court judgment, which has not been subjected to appellate review, serve as a "commentary" on the performance of public officials. It has already served that function. The stipulated reversal would merely be a reminder that the "commentary" did not face appellate review. Moreover, the interest in commentary pales in comparison to the direct interest in saving $4 million. We think it fanciful to embrace the assumption that the public is willing to pay $4 million for a "commentary." The average taxpayer wants and deserves more for his or her money.

Moreover, thwarting the settlement would be needlessly unfair to the parties. They would be denied a settlement on the terms they desire even though no substantial competing interest is apparent. Indeed, they would be punished for not being prescient. When this case was in the pretrial stage, there was no extant decision by this court and very little Court of Appeal authority one way or the other. (The Court of Appeal in this case noted the "dearth of helpful case law.") On the other hand, the Courts of Appeal had routinely been allowing the type of settlements fashioned by the parties, e.g., stipulated reversals and the like. Even if a rule precluding stipulated reversals had some merit for future cases (a conclusion we reject), we would be unfair at this late stage to impose a prophylactic rule retroactively. Doing so would achieve nothing but unfairness to the parties, with no countervailing benefits.

### DISPOSITION

The judgment of the Court of Appeal (i.e., the order denying the motion for stipulated reversal) is reversed, and the cause is remanded to the Court of

Appeal with directions to issue a new order granting the parties' request for a stipulated reversal of the trial court judgment and dismissing the appeal.

Lucas, C. J., Panelli, J., Arabian, J., and George, J., concurred.

MOSK, J.—I concur under the facts of this case.

Nevertheless I am concerned about some of the implications of the majority opinion. In particular, their conclusion that a Court of Appeal should grant a stipulated reversal "absent a showing of extraordinary circumstances that warrant an exception" (maj. opn., *ante,* p. 275.) is too broad a rule. I would leave the matter entirely to the discretion of the appellate court.

It is not difficult to conceive that a defendant held liable for a product found by a court or jury to be negligently designed or manufactured would be eager to wipe that judgment out of existence in order to deter other victims from seeking recourse. And it is not difficult to understand that the victorious plaintiff would be so eager to collect on the judgment that he or she would give scant consideration to its potential effect on other victims. Yet the appellate court should give weight to such factors in its discretionary determination whether to approve a stipulated reversal.

Other equally serious scenarios can be conceived. Thus I cannot join in the majority's gratuitous creation of some type of "presumption." I trust that will be deemed a mere dictum. I do approve of their apparently conflicting suggestion that the circumstances must be examined on a case-by-case basis. No more is needed.

KENNARD, J.—I dissent.

More than just a dispute resolution service, the judiciary is an integral part of our government. Working in the context of actual disputes, courts interpret and enforce the policies adopted by the legislative process, striving always to give those policies coherence and vitality. Thus, when a trial court renders judgment in a particular case, it is not just deciding who wins and who loses, who pays and who recovers. Rather, the ultimate purpose of a judgment is to administer the laws of this state, and thereby to do substantial justice.

Because a judgment embodies an act of government, its annulment must be reconciled with public as well as private interests. And because stipulated reversals tend to diminish public respect for the judiciary and to discourage prejudgment settlements, appellate courts should carefully examine the parties' reasons for seeking stipulated reversal and should attempt to determine

whether the judgment sought to be annulled has value for third parties or for the public at large.

In this case, the parties have presented no legitimate reason for seeking reversal other than facilitation of postjudgment settlement. A judgment duly rendered by a court of this state is a matter of some gravity, not a trifle to be annulled for no better reason than that one party wishes it and has purchased the other party's acquiescence by a substantial cash settlement. Moreover, the judgment that the parties would annul, which was entered on a jury verdict after a full trial of the merits, has public value because it provides a carefully considered assessment of the performance of a public institution.

Nonetheless, the majority directs the Court of Appeal to grant the motion for stipulated reversal. The majority adopts a rule requiring appellate courts to grant motions for stipulated reversal unless grounds for denial clearly appear. I disagree. The presumption should be against stipulated reversal, not in favor of it.

## I. STIPULATED REVERSALS ERODE PUBLIC CONFIDENCE IN THE JUDICIARY

In this case, the Court of Appeal explained its denial of the parties' application for stipulated reversal in part by stating that "the reversal of a judgment not thought to be legally erroneous simply to effectuate settlement would trivialize the work of the trial courts and undermine the integrity of the entire judicial process." I agree.

Public respect for the courts is eroded when this court decides that a party who has litigated and lost in the trial court can, by paying a sum of money sufficient to secure settlement conditioned on reversal, purchase the nullification of the adverse judgment. (See Fisch, *Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur* (1991) 76 Cornell L.Rev. 589, 631 [hereafter *Rewriting History*].) Thus, this court's adoption of a rule establishing a "strong presumption" in favor of stipulated reversal will reinforce an already too common perception that the quality of justice a litigant can expect is proportional to the financial means at the litigant's disposal.

The potential damage to public confidence in the judiciary can be readily appreciated by contemplating an extension of the majority's holding in this case—that is, that parties are entitled to a stipulated reversal absent extraordinary circumstances—to the judgments and decisions of appellate courts. The majority's reasoning would readily permit such an extension. Yet I doubt

that the majority would be as receptive to the parties' arguments about the benefits of settlement if the parties were seeking to annul by stipulation a decision of this court.

For example, suppose that the Regents of the University of California had been displeased by this court's opinion in *Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120 [271 Cal.Rptr. 146, 793 P.2d 479, A.L.R.4th 3659], believing it afforded inadequate protection to socially valuable medical research, and had made plaintiff Moore a settlement offer on condition that this court vacate its opinion. If Moore had accepted the offer, the parties could have joined in a stipulation that rehearing be granted and review be dismissed as improvidently granted. Granting the parties' request in such a case might avoid a costly trial and possibly result in a savings of tax dollars. Even so, I suspect the majority would never consider these to be sufficient grounds to obliterate its own work product.

But the work product of our trial courts deserves respect too. Trial courts are the focal point of the judicial system, providing the final resolution for the vast majority of the lawsuits filed each year. On an appeal, a trial court's judgment on the merits is presumed to be correct. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) To casually discard a presumptively correct trial court judgment, without any showing of legal error, cannot help but demoralize trial judges and jurors. If this court by its actions shows little regard for the work of trial courts, we can hardly expect the public to hold them in high esteem.

## II. STIPULATED REVERSALS DISCOURAGE PRETRIAL SETTLEMENTS

The majority devotes most of its opinion to making the point that public policy encourages settlements, at both the trial and appellate levels, because they conserve judicial resources, relieve parties of the emotional and financial burdens and risks of further litigation, and permit them to reconcile. I agree entirely that settlements are beneficial, that it is never too late to settle, and that the judiciary should actively encourage settlement at every stage of litigation. But I disagree with the conclusions the majority seeks to draw from these noncontroversial propositions. I question whether the rule the majority adopts, which requires appellate courts to grant requests for stipulated reversal in the absence of extraordinary circumstances, will significantly increase the overall rate of settlements on appeal. Moreover, I am persuaded that the majority's decision will reduce the incentive for pretrial settlements.

During the pendency of an appeal, the parties can always end the litigation by settlement. When notified of a settlement, an appellate court will ordinarily dismiss an appeal as moot, and the parties may then file a satisfaction

of judgment in the trial court, formally bringing the lawsuit to a close. This is the normal manner in which appellate settlements occur. Appellate courts should and will continue to encourage parties to reach this kind of settlement, which leaves the trial court's judgment intact.

Another form of settlement is commonly used in cases on appeal when the decision to settle reflects an agreement that the appeal is meritorious. In this situation, the parties may obtain reversal of the judgment by presenting their agreement to the appellate court in the form of a "confession of error." (See *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1509 [258 Cal.Rptr. 267]; *Barton* v. *Maal* (1936) 12 Cal.App.2d 353, 354 [55 P.2d 529]; see generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 366, pp. 367-369.) A reversal under these circumstances is for legal error and is not a stipulated reversal as that term is used in this case.

There is no empirical evidence that these two forms of settlement are inadequate, and that a significant number of cases can be settled on appeal *only* by granting a stipulated reversal of the judgment. Although the majority asserts that the Courts of Appeal have routinely granted motions for stipulated reversal, this assertion is based on documents submitted to this court by the defendants in support of their petition for review. Those documents, evidently the result of defendants' exhaustive search of appellate court records, reveal just 12 stipulated reversals by the Courts of Appeal in a 4-year period, during which the Courts of Appeal resolved many thousands of appeals by written opinion. Thus, stipulated reversal appears to be a rare occurrence in our appellate courts.

Many parties who would prefer a stipulated reversal would settle even without it to avoid the uncertainties of further litigation. Indeed, that may well be true of the parties to this case. We will never know whether these parties would have settled anyway, without stipulated reversal, if this court had upheld the decision of the Court of Appeal.

Even if one assumes that liberal exercise of the authority to grant stipulated reversal will appreciably increase the number of cases settled on appeal, there will be a significant cost for that benefit. If an adverse judgment can be deleted by a postjudgment settlement with stipulated reversal, parties concerned about the collateral consequences of an adverse judgment will have less incentive to settle their cases before trial and judgment. Cases that would have settled pretrial, with minimal judicial involvement, will be tried before a court or jury, perhaps for days or even months, only to have the court or jury's considered decision erased by a stipulated reversal.

The most thorough treatment of this question appears in a recent law review article by Professor Fisch of Fordham University School of Law. (*Rewriting History, supra,* 76 Cornell L.Rev. 589.) Professor Fisch states her conclusion in these terms: "[A] rule of law which routinely permits post-settlement vacatur of judgments actually distorts the settlement process. Such a rule may encourage litigants to delay settlement until a later stage in the litigation. This delay results in a waste of judicial resources." (*Id.* at pp. 592-593.)

Professor Fisch observes that judgments have a variety of collateral costs to the losing party. Perhaps the most significant of these collateral costs is the judgment's preclusive effect in future litigation under the doctrines of res judicata and collateral estoppel.[1] Other important collateral costs are adverse publicity engendered by the decision and damage to reputation. (*Rewriting History, supra,* 76 Cornell L.Rev. at pp. 593, 624-629.) In some cases, "[t]he collateral costs of a judgment may be substantially greater for the losing party than the immediate costs of complying with the judgment." (*Id.* at p. 594.)

When the collateral costs are significant, as they often are, the prospect of incurring these costs provides a powerful incentive for settlement. Yet, as Professor Fisch explains, the availability of stipulated reversal essentially eliminates this factor as an incentive for *pretrial* settlement. As she writes: "In effect, if a litigant is certain that the court will subsequently vacate an adverse judgment, the availability of vacatur makes going to trial cost-free, apart from litigation costs. A litigant may roll the dice, gamble on a favorable judgment and, if unsuccessful at trial, settle the case after judgment and move for vacatur. After settlement and vacatur of the trial court decision, the litigant will be no worse off than if he or she had avoided a final judgment by entering into a pretrial settlement." (*Rewriting History, supra,* 76 Cornell L.Rev. at p. 596, fns. omitted.)

The majority makes much of the incentives for pretrial settlement that remain even under a regime in which stipulated reversals are freely available on appeal. As Professor Fisch acknowledges, failure to settle before trial will still require the parties to incur litigation costs, and it will increase the settlement demands of the party who prevails at trial. Nevertheless, by converting a judgment from a solemn public pronouncement—irrevocable

---

[1] The majority expressly reserves the question whether a judgment's potential use for purposes of res judicata or collateral estoppel would provide a proper ground for denying stipulated reversal. Although concern about this particular collateral consequence is perhaps the most common basis for requesting stipulated reversal (see, e.g., *Ringsby Truck Lines* v. *Western Conf. of Teamsters* (9th Cir. 1982) 686 F.2d 720), I agree that the question need not be decided in this case.

absent demonstrated legal error—into little more than a bargaining chip in ongoing settlement negotiations, a rule favoring stipulated reversals diminishes one very significant incentive for pretrial settlement.

The Seventh Circuit, in an influential opinion by Judge Easterbrook, has recognized that its practice of always denying requests for stipulated reversal has the salutary effect of encouraging settlements before trial and judgment. (*Matter of Memorial Hosp. of Iowa County, Inc.* (7th Cir. 1988) 862 F.2d 1299, 1302.) The District of Columbia Circuit has adopted the same rule and has expressly endorsed Judge Easterbrook's reasoning (*In re U.S.* (D.C. Cir. 1991) 927 F.2d 626, 628 [288 App.D.C. 354]), as has the Third Circuit (*Clarendon Ltd.* v. *Nu-West Industries, Inc.* (3d Cir. 1991) 936 F.2d 127, 129.)

Thus, I am not persuaded that the public policy favoring settlements will be well served overall by the rule mandating stipulated reversal absent extraordinary circumstances. The modest immediate gain in increased appellate settlements will, I fear, be more than offset by the long-term cost in terms of fewer pretrial settlements.

III. THE JUDGMENT SHOULD BE PRESERVED FOR ITS PUBLIC VALUE

An appellate court should deny an application to reverse a judgment on stipulation to effectuate settlement if the judgment has value to one not a party to the action. A published decision illustrates this principle. The parties to an appeal sought reversal of an interlocutory judgment dissolving a marriage and dividing the community property. The husband had died after judgment, and the executor appointed to administer his estate had been substituted in his place (see Code Civ. Proc., § 385). The executor and the widow entered into a settlement agreement that was conditioned on reversal of the judgment. The parties maintained that reversal was necessary because a division of the community property under the judgment, as compared to a distribution through probate proceedings, would cause the widow to " 'suffer substantial and unnecessary tax burdens.' " (*In re Marriage of Shapiro* (1974) 39 Cal.App.3d 460, 462 [114 Cal.Rptr. 277], italics omitted.) The Court of Appeal denied the application. Writing for the court, Presiding Justice Kaus explained that the parties' settlement did not moot the case, that the court knew nothing of the merits of the community property division, and that reversing the judgment would be improper because it would "have consequences affecting interests not directly involved in this proceeding, that is, those of the taxing authorities." (*Id.* at p. 464.)

There are some cases in which a judgment has value for society at large, even though it has no particular value for any identifiable nonparty. In this

category fall cases to which a public official or public agency is a party, and in which the propriety of that party's official acts is placed in issue. Certainly the public has an interest in an evaluation of the performance of public employees and public institutions. When that evaluation is made through litigation in state courts, and therefore obtained through the expenditure of public resources, the parties' preference for settlement is not a sufficient reason to nullify the judicial product. (See *Matter of Memorial Hosp. of Iowa County, Inc., supra*, 862 F.2d 1299, 1302 ["When the parties' bargain calls for judicial action . . . the benefits of settlement to the parties are not the only desiderata."].)

Here, the majority has determined that the trial court's judgment has no value worth preserving. To show the error of this conclusion, it is necessary to briefly review the facts of the case.

To avoid a scabies mite infestation, state and federal agricultural agencies treated George Neary's herd of pregnant heifers with the insecticide Toxaphene. At least 95 of the heifers died after the treatment, as did more than 400 calves. Neary believed that the treatment had caused these losses, and he was not shy about saying so. Eventually, Neary and state agricultural officials agreed to have the matter investigated by veterinarians employed by the University of California at Davis in its School of Veterinary Medicine. Three of the university veterinarians visited the ranch where the cattle had been treated.

A few months later, over Neary's objections, the university published a report of the investigation, having concluded that publication was required under the California Public Records Act (Gov. Code, § 6250 et seq.). The report, which was written by two of the three veterinarians who had visited Neary's ranch, was discussed widely in the print and broadcast media. It concluded that the heifer and calf losses were not caused by pesticide poisoning, but instead by mismanagement at Neary's ranch. Neary sued the university and the veterinarians for libel. After a four-month jury trial, Neary obtained a verdict and judgment against all defendants for $7 million.

As this account reveals, the judgment that Neary obtained is undoubtedly a matter of significant and legitimate public interest. The defendants in this lawsuit are a public university and three professionals who are its employees. The subject of the dispute is a report written by these professionals in the course of their employment for the university and published as a public record. Both the employees' salaries and the publication of the report were funded with public tax moneys. The jury determined that the report contained false statements and that the report's authors had made these statements with malice. It further concluded that these false statements had

damaged the reputation of plaintiff, a locally prominent cattle rancher. Because the judgment embodies the jury's carefully considered assessment of the performance of a public institution in one not insignificant incident, it should not be set aside merely because some of the defendants insist on the judgment's destruction as a condition of settlement.

## IV. THE PARTIES HAVE OFFERED NO LEGITIMATE REASON FOR STIPULATED REVERSAL

The majority does not probe the legitimacy of the parties' reasons for requesting stipulated reversal in this case. For the majority, it is enough that the reversal will permit the parties to finalize a settlement that is apparently beneficial for them and that relieves the judiciary of any further burdens in this case. Taking as its motto "courts exist for litigants," the majority concludes that an appellate court should be willing to perform an act that the parties have requested as a condition of postjudgment settlement unless the act can be shown to be harmful.

But this reasoning, which allows parties to dictate an appellate court's actions, could lead to absurd results. Suppose, for example, that the parties conditioned settlement on the appellate justices wearing green robes on Saint Patrick's Day, or singing "California Here I Come" before court proceedings. Would the majority weigh the benefits of settlement against the slight inconvenience of performing the requested act, or would it instead ask whether the act itself was proper, whether it would be demeaning for courts to humor the parties' whimsical demands in this fashion?

Moreover, the parties here have requested the appellate court to perform the inherently judicial act of reversing a judgment. Thus, to bring the example a little closer to the facts of this case, we may suppose that the action had been tried to the court without a jury and that after entry of judgment, and while the case was on appeal, the parties had agreed to a settlement conditioned on an order of the appellate court reversing the judgment and remanding to the trial court with directions to redraft the findings in rhyming couplets or using only words of Anglo-Saxon origin, or to include in the findings a totally irrelevant summary of the nutritional benefits of sunflower seeds. In such a case, should an appellate court exercise its judicial power, should it make an order that may well be within its authority to make, for no better reason than to effectuate settlement? I submit it should not. Even when it clearly appears that the requested judicial act will do no injury to any identifiable third party or to the public, the dignity and purpose of the judiciary must be considered. Courts must look beyond the benefits of settlement to determine whether there is a substantial

and legitimate reason for the judicial act upon which the parties have conditioned their settlement.

Thus, it is necessary to inquire why the parties in this case have conditioned settlement on reversal of the judgment. If there is no substantial and legitimate reason for their request, then the Court of Appeal properly declined to annul the presumptively valid judgment of the trial court.

The parties assert that reversal is necessary because the defendant veterinarians insist upon it to protect their professional reputations. At the same time, they assert (and the majority agrees) that a stipulated reversal would not imply that the judgment is defective on the merits but would merely add an additional document to the case file establishing that the judgment never received appellate review and that the action terminated by compromise and settlement.

The parties may not have it both ways. Either the stipulated reversal reflects on the judgment's validity or it does not. If, as both the parties and the majority insist, a judgment's validity is unaffected by stipulated reversal, then logically a stipulated reversal cannot restore the veterinarians' tarnished reputations. To grant stipulated reversal in this situation would, at best, encourage the veterinarians' self-delusion or, at worst, actively assist the veterinarians in practicing a deception on their professional colleagues. If all the parties need is a document showing that the judgment never received appellate review, and that the action terminated by compromise and settlement, they should be satisfied with an order dismissing the appeal as moot by virtue of settlement.

## V. CONCLUSION

The rule the majority adopts, which mandates reversals of judgments on direct appeal simply to permit settlements, undermines judicial efficiency by encouraging parties to try cases rather than settle them. It also erodes public confidence in the judiciary by fostering the perception that litigants having sufficient wealth may buy their way out of the ordinary collateral consequences of public adjudications.

Although I agree with the majority that appellate courts have discretion to grant stipulated reversals in appropriate cases, I would adopt a different rule to guide the exercise of that discretion. When parties request that a trial court's judgment be reversed to effectuate settlement, appellate courts should deny the request if there is a reasonable possibility that the interests of nonparties or the public could be adversely affected by reversal. If there is

no reasonable possibility of adverse impact on third parties or the public, then the court should weigh the parties' reasons for requesting stipulated reversal against the other institutional concerns I have mentioned—the erosion of public trust likely to result from an appearance that the nullification of a judgment can be purchased, and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlements.

This does not mean that I am against postjudgment settlements or in favor of forcing parties to litigate against their will. Parties are free at any time to settle their private dispute on terms mutually agreeable, and should be encouraged to do so. What they should not be free to do is to include within those terms of settlement the destruction of a judgment, a public product fashioned at the cost of public resources, and to require an appellate court to accomplish that destruction merely to facilitate resolution of their private dispute.

Here, as I have explained, the judgment possesses significant public value and the parties have offered no substantial and legitimate reason for reversing it. In my view, the Court of Appeal acted correctly when it denied the motion for stipulated reversal.