Filed 8/27/15  Marks v. Lasalle CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LEE MARKS, | |
| Plaintiff and Appellant, | G050004 |
| v. | (Super. Ct. No. 30-2011-00459265) |
| ANGELE LASALLE et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss, Judge.  Affirmed in part, reversed with directions in part.

Law Office of Frank W. Battaile and Frank W. Battaile for Defendants and Appellants Angele Lasalle and Angeline Dao.

Arent Fox, Victor P. Danhi, Steven A. Haskins and George N. Koumbis for Defendants and Appellants First Recovery Repossession Services, Inc. and Barry Shapiro.

Law Offices of Andrew D. Weiss and Andrew D. Weiss for Plaintiff and Appellant Lee Marks.

## I. PROLOGUE

This case has the makings of a classic film noir story, though thankfully, despite animosity so thick between two of the parties the trial judge made a specific finding on it, no one has been murdered. The plaintiff is an actor. The actor has a fiancée. The fiancée has a younger sister. The younger sister has a bad gambling habit. She used to have a domestic partner who enabled that habit. In better days the two were high rollers. They would get free rides on private jets. They owned a fabled black credit card. They drove a Range Rover. The partner owned a Bentley. They lived in a house in Huntington Beach.

But those were better days. To raise $40,000 for a Las Vegas poker tournament the domestic partner hocked her 2006 silver Bentley to the actor. The partner expected the younger sister would win big and they would be able to repay the money and redeem the Bentley. It didn't happen. The forty grand was lost in Vegas. Nine months later, the partner sold off the Bentley to the actor in return for another $51,880 cash infusion for, as it turned out, yet more unsuccessful gambling.

Well, at least the *actor* thought the deal was a sale. The partner thought they had a *lease* agreement. That is, the partner thought the actor or his fiancée would pay the partner a monthly payment equal to the payments the partner had to make to the finance company. Then what was the $51,880 for? And since, in January 2011, the actor had the car and wasn't making "lease" payments to the partner, she decided to get the car back from him. She first employed an unlicensed repossession agent, but his attempts were aborted when the actor confronted him late at night. A few months later she contacted a licensed repossession agent – the "repo man" in this nascent drama. He eventually succeeded. The day after the repo man seized the car it was returned to the partner. She then met her mother at a local BMW dealer, where she gave the Bentley to the dealer, and the mother received credit from the Bentley toward a Porsche. We had descended from film noir to reality TV.

2

The actor sued the partner, the repo man, and the mother for conversion. The judge held the partner and the repo man liable for the value of the Bentley on the theory they had converted the actor's property. The judge let the mother off the hook because she had no idea her daughter no longer owned the Bentley. The partner and the repo man now appeal from the portion of the judgment holding them liable, and the actor cross-appeals from the portion of the judgment letting the mother go. We affirm the judgment in favor of the actor as against the partner and the defense judgment in favor of the mother. We also grant a stipulation for reversal of the judgment against the repo man and his company. As we explain below, nonparties or the public will not be affected by such a reversal. And the reasons for the reversal readily outweigh (particularly in this case) whatever erosion of the public trust that might result from the stipulated nullification of the trial court judgment as to the repo man and his company.

## II. FACTS

Half the story here is sorting out the characters. Plaintiff Lee Marks has been a police officer. He is now an actor and a model, and has appeared in several movies.[1] Marks has a fiancée who is referred to in the briefs as "Linh Luu."[2] Linh has a younger sister who is referred to as "Tho" (or sometimes Tho Luu).[3] The parties to this appeal all agree that Tho has had a serious gambling problem, though on occasion she has won large amounts of money. She won $300,000 in a tournament in 2008. Since 2000, Tho has been in a relationship with her former domestic partner, defendant Angele T. Lasalle.[4] The degree to which Lasalle herself has had a serious gambling problem is not clear, but there is no dispute she accompanied Tho to Las Vegas on many weekends.

---

[1]      Including 2003's Hood Angels, where, perhaps somewhat ironically given the events in this case, he played a character being car jacked. (<http://www.imdb.com/name/nm1053545/> [as of Aug. 3, 2015].)

[2]      Also known as Nhut Minh Luu. Because Linh Luu has a sister, to avoid confusion we will refer to her and her sister by their first names, no disrespected is intended.

[3]      Full name being Minh Tho Si Luu.

[4]      We follow her own appellant's brief and spell her name without capitalizing the S.

Lasalle, in turn, has a mother, defendant Angeline Dao, who is a dermatologist, for whom Lasalle has worked since 1998 as an office manager.

But the true protagonists in this drama are defendant Barry Shapiro – the "repo man" to whom we have referred above – who owns First Recovery Repossession Services, Inc., a licensed repossession company,[5] and the main character around which this appeal revolves: a 2006 silver Bentley. The Bentley made its entrance in 2008 when Lasalle bought it from a Newport Beach auto dealer for $135,000. It was the second car in the Tho-Lasalle household. The other one was a Range Rover.

In terms of the applicable standard of review, Lasalle does not challenge the sufficiency of the evidence. Her appeal, rather, is twofold: (1) she contends it was an abuse of discretion to deny a continuance of trial to allow her to furnish discovery on a LASIK[6] procedure she had on April 9, 2010, and (2) it was an abuse of discretion not to admit evidence of certain guilty pleas entered into by Linh in the mid-to-late 1990's. Because Lasalle argues a continuance was necessary so that she could present what was essentially an alibi defense to the $51,880 contract – the alibi being she had LASIK surgery the day she signed the contract – we must set forth the competing stories of the parties:

(1) *Marks' story*: At trial, plaintiff Marks presented a consistent easy-to-follow narrative. By 2008, he considered Linh his wife, though they have never married nor had he, by the time of trial, actually proposed. In July 2009, he loaned Linh's sister Tho and Tho's domestic partner Lasalle, $40,000 for a tournament in Las Vegas.[7] From

---

[5]  Because there is an alter ego issue raised in this appeal, when we refer to Shapiro and his corporation collectively, we will call them "First Recovery-Shapiro" to remind readers they are separate entities. Otherwise we refer to them individually as the context demands.

[6]  "LASIK" is the commonly used name for "laser assisted in situ keratomileusis."

[7]  Marks testified he was by then somewhat in awe of the high-roller lifestyle led by Linh's sister Tho and her partner Lasalle. He gave some examples at trial: The four of them (Marks, Linh, Tho, and Lasalle) were given special treatment at the MGM Grand in Las Vegas, complete with their own private elevators. They got better seats at a boxing match than Denzel Washington, who sat behind them. Marks ate sharksfin soup at $200 a cup. And the four were flown to Vegas in a private jet a half-dozen times.

4

his point of view, Tho and Lasalle were married to each other so a loan to one was a loan to the other. The process of the loan was simple: Marks took $40,000 in hard cash from his private safe and gave it to Linh, who then gave it to Tho and Lasalle. In return, Lasalle signed a written contract giving Marks a security interest her Bentley.[8] However, there was no effort on the part of either Tho or Lasalle to pay him back in 2009 or early 2010, so in April 2010, the parties turned the loan into a sale, in effect making the transfer of the Bentley a two-part transaction. In part two of that transaction, Marks gave Tho and Lasalle another $51,880 in cash – the amount necessary to pay off the finance company's loan on the car at that point – in return for outright ownership of the Bentley. The sale was memorialized in a written contract dated April 9, 2010, the terms of which were: Lasalle was selling the Bentley to Marks for $91,880 (the previous $40,000 unpaid loan plus the additional $51,880), with Lasalle promising to be responsible to the finance company for the existing loan.[9] Structured that way – instead of, say, Marks simply taking over the payments or paying off the finance company directly – Tho and Lasalle got immediate cash for gambling while having the option of being able to pay off the finance company in installments of about $1,500 a month. At trial, a handwriting expert opined that the signature on the April 9, 2010 contract was, indeed, Lasalle's.

But Lasalle got it into her head that *she* still owned the Bentley, so in January 2011, she engaged an unlicensed repossession agent to recover the car. His attempts were aborted when Marks personally confronted him. A few months (March 2011) later, still not having received title to the Bentley, Marks filed this suit. But in late April 2011, Lasalle engaged Barry Shapiro's firm First Recovery to repossess the

---

[8] "Security interest" is our phrase. The actual handwritten contract, consisting of just one paragraph, is in our record and is structured as a straight-out sale. Marks, however testified that he thought of the deal as a loan, and only wrote it up as a sale because he thought that in order to be able to keep the car if the loan wasn't paid, the loan had to be structured as a sale. Substantively, that sounds like a security interest to us.

[9] Here is the April 9, 2010 contract, verbatim: "I, Angele Lasalle, sold my Bentley Continental GT 2006 to Lee Marks for $91,880, paid in full. I promise to pay the remaining balance of the vehicle owned to Bentley Financial. Lee Marks is responsible for future registration fees, insurance and maintainance."

Bentley, based on the claim she was the registered owner. By mid-September, First Recovery found the Bentley in a parking structure in Los Angeles, and, using a "dolly tow," was able to seize the car. The next day First Recovery returned the Bentley to Lasalle, who promptly took it to a BMW dealer. There, it was traded in and the proceeds of the trade-in were applied to a Porsche her mother Dao bought.

(2) *Lasalle's story*: Lasalle's alternative version of events is harder to piece together than Marks'. Here is our attempt: Lasalle said the July 2009, $40,000 contract was arranged by Tho as part of an aborted deal in which Marks and Linh would pay $40,000 for the Bentley, and then finance the balance to buy it from Lasalle. But Marks and Linh couldn't find financing, so Lasalle agreed to *lease* the Bentley to them for the amount of her payments (about $1,500) a month. The payments made by Marks and Linh would be credited against the $40,000 which she said Tho owed Marks and Linh. Meanwhile, Lasalle kept making the monthly payments. A few months later, after a spat with Tho, Lasalle wanted the Bentley back, since she didn't want to share their other car, the Range Rover, with Tho. The Bentley was returned to her, and Lasalle had the car from that point – sometime in the fall of 2009 – through June 2010. Then the Bentley went back to Marks and Linh.

But in November Lasalle and Tho broke up for good. Lasalle got the car back again. The very next month, in early December, Lasalle leased the Bentley (again) to Linh, on the same terms as before, that is, Marks or Linh would pay Lasalle an amount ($1,500) about equal to the amount of the payments to the finance company Lasalle had to make. But Marks didn't make those payments, so in January 2011, Lasalle decided she'd had enough and engaged the services of an unlicensed repossession agent. That particular agent, however, was unsuccessful. Finally, after she was served with Marks' March suit about April 9, Lasalle engaged Shapiro's First Recovery firm to go get the

6

Bentley.[10] He succeeded on September 16, returned the car to Lasalle on September 17, and on the very same day she met her mother Dao at a BMW dealer, where she traded in the Bentley for a Porsche for Dao.

As one might guess given her position, Lasalle contended from the beginning of the case that her signature on the April 9, 2010 written contract (quoted in footnote 9 above) was a forgery. And that brings us to her motion for a continuance, filed ex parte August 2, 2013, just three days before trial was to begin.

The story behind the continuance motion was this: Back in February 2013, Lasalle's prior counsel had directed her office staff to send to Marks' counsel an electronic copy of Lasalle's medical file for the LASIK surgery she had on April 9, 2010. However, at an issues conference held July 29 (that is, a week before trial was scheduled to start), Marks' counsel said he hadn't received the medical file for the April 9, 2010 LASIK procedure, and made clear he would oppose admission of evidence concerning the LASIK procedure since there had been no opportunity to do any discovery on the matter. Lasalle argued a short continuance was necessary to make up for the mishap so that Marks' counsel could take discovery on the matter and, more importantly, so that evidence of the LASIK surgery could be presented to the trier of fact at the continued trial.

Marks' opposition to the motion centered on the point that for two years (since August 2011), Lasalle had never asserted that the *LASIK* procedure had made signing the document impossible. His opposition noted that Lasalle's motion, which included the medical file, actually contained no evidence totally excluding the possibility Lasalle could have signed the contract. The opposition thus quoted from the post-

---

10     The record and Lasalle's briefing are both vague on the events that actually triggered Lasalle's decision to engage the services of repossessors. Her opening brief gives no record references on that precise point. And her trial brief was just as fuzzy as to *precisely* why Lasalle decided to engage repossession agents beginning in 2011. The clearest explanation we have encountered was the one given by Lasalle's trial counsel in closing argument: When Tho told Lasalle (apparently in January 2011) that Linh had no intention of giving the Bentley back, she decided to have it repossessed.

7

procedure instructions given Lasalle by her doctors which indicated she *could* have been able to see in the immediate aftermath of the procedure. The opposition also referenced the website of the surgeon who performed the procedure on Lasalle that said a patient should keep her eyes closed for "2 to 4 hours afterwards," and "avoid reading" for the first 24 hours afterwards. The surgeon's website thus allowed for the possibility Lasalle could easily have signed her name to a one-paragraph contract in the late afternoon or evening of April 9.

At trial, Lasalle's counsel's fears came to pass. The motion to continue was denied and all evidence of the LASIK was excluded.[11] The judge reasoned it was unfair to hide that aspect of the defense from opposing counsel.

After the trial, the judge issued a statement of decision. The statement basically adopted Marks' version of events: Marks had paid for the Bentley in a two-step process in which he first loaned Tho and Lasalle $40,000, then gave them an additional $51,880 to transform the deal into a straight-out purchase. The court found Marks' testimony about the understanding of the parties to be credible, and noted the repossession of the Bentley constituted "conversion of property that belonged to Marks." The fair market value of the Bentley was $91,880 at the time. The court subsequently entered a judgment for that amount against Lasalle, First Recovery *and* Shapiro personally. However, the court also found that Lasalle's mother Dao knew nothing of Marks' ownership in the Bentley at the time she received the Porsche and declined to include Dao in the judgment. The court further found none of the parties committed fraud, thus Marks was not entitled to any punitive or emotional distress damages. Both Lasalle and First Recovery-Shapiro filed timely appeals from the judgment.

---

[11]    The case had been assigned to Judge McEachen from the beginning. It was he who denied the continuance. It was then sent to Judge Moss for actual trial. It was Judge Moss who excluded the evidence of the LASIK procedure.

### III.  DISCUSSION

A.  *Lasalle's Appeal*

1.  *The Continuance*

Lasalle argues it was an abuse of discretion to deny the continuance, and, concomitantly, to exclude the evidence of the LASIK surgery.  She characterizes the exclusion of the LASIK evidence as a de facto discovery sanction out of proportion to previous counsel's mere inadvertence in mistakenly not sending over the medical file.

What is conspicuously missing in Lasalle's argument is a recognition of the basic reason the trial judge denied the continuance in the first place:  Lasalle herself had engaged in the unfair strategy of concealing the LASIK defense.  Lasalle is unable to point to anything in the record prior to the issues conference a week before trial in which she explicitly asserted that LASIK surgery was *the reason* she could not have possibly signed the April 9, 2010 document.  The best she can do is to note two of her LASIK doctors were listed on her February 2011 expert witness list.  But even that list, as framed, was misleading.  The two LASIK doctors were designated as "non-retained *experts*" – our emphasis – when it would have been more accurate to refer to them as percipient witnesses; after all, their importance to Lasalle's case was being able to testify about precisely how Lasalle's surgery specifically affected her at the time.  What was worse, there was no indication on the list that the surgeons were connected to the LASIK procedure.  It was thus eminently reasonable for the trial court to conclude that Lasalle had played "hide the LASIK" during discovery.

Lasalle's failure to make explicit her reliance on LASIK surgery is all the more significant when one realizes that Marks did make it clear he was going to offer the testimony of a handwriting and document expert to establish that the signature on the April 9, 2010 contract was genuine.  (Lasalle did not offer any expert handwriting testimony on her own.)  Lasalle thus had plenty of notice that Marks contended the April

9

9, 2010 signature was genuine, and if she was going to say it wasn't – and had some independent basis like eye surgery to back up her claim of forgery – she should have disclosed it.

We need only add that there was no injustice in the exclusion because the procedure itself was of only minimal relevance to the forgery issue. The April 9, 2010 contract was short, handwritten, and could easily have been signed any time prior to Lasalle's 11 a.m. surgery, or, giving credence to the opposition citation to her doctor's website, by late that afternoon or evening. There was simply no abuse of discretion in denying the continuance and then precluding evidence of a belatedly-articulated *factual* theory.

2. *The "Prior Criminal" Evidence*

Marks also moved in limine to exclude evidence of plea bargains Marks' fiancée Linh made for assault, petty theft and threatening a witness in the period 1994 through 1999. The charges apparently stemmed from her involvement in an Asian gang. Lasalle argued against the motion on the theory that the Luu sisters had a way of intimidating Lasalle, so that she "signed things because she was afraid of Tho Luu." That is, Lasalle's theory was the evidence of the criminal past was not being offered to prove that Linh or her sister Tho were bad people as such, but to show Lasalle's fearful state of mind, i.e., she was involved with tough guys and she was afraid of them. The trial judge agreed with Marks' counsel that the evidence did not relate to any current threats that might have prompted Lasalle to sign a document and precluded the evidence.

The trial judge's decision regarding the prior criminal charges evidence was also well within reason. The proffered evidence was distant in time from events in the case, taking place during a period 20 years ago, entirely before Lasalle met Tho in 2000. The evidence was offered merely to show a vague fear on Lasalle's part, not in connection with any concrete argument involving specific duress in signing the April 9, 2010 contract. And Lasalle suffered no prejudice from the exclusion in any event,

10

because it did not affect her continued ability to testify to any actual intimidation or duress in regard to either the July 24, 2009 or the April 9, 2010 contracts.

B. *First Recovery and Shapiro's Appeal*

The trial judge included not only First Recovery, but Barry Shapiro personally as jointly liable on the judgment for conversion. To counter that inclusion, First Recovery and Shapiro now argue on appeal that, as a licensed repossession agency, First Recovery is statutorily immune, under Business and Professions Code section 7507.13.[12]

We do not, however, reach the merits of the argument. As noted, there is a joint request by Marks and First Recovery-Shapiro to set aside the judgment as to First Recovery-Shapiro. The stipulation was submitted just before oral argument in this court.

After Justice Kennard's dissent in *Neary v. Regents of University of California* (1992) 3 Cal.4th 273, 284 the Legislature enacted subdivision (a)(8) of section 128 of the Code of Civil Procedure to govern stipulated reversals. The statute sets up two criteria that must be met before an appellate court may accept a stipulated reversal: There must be (A) "no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal" and (B) the reasons for the reversal must "outweigh" whatever "erosion of public trust" that might result from nullification of the judgment and the "risk" that the "availability of stipulated reversal will reduce the incentive for pretrial settlement."

In the present case, we think both criteria are met. As to the first, the *worst* thing that can be said about the effect of the stipulated reversal on nonparties or the public is that it *might* deprive them of an opinion explicating section 7507.13, assuming, arguendo, we were to publish it. No doubt such an explication would be of significant interest to the repossession industry. However, without giving too much of the game

---

[12] All statutory references to section 7507.13 or to any statutory subdivision are to the Business and Professions Code.

11

away, let us merely say that Marks has presented a formidable argument on appeal that First Recovery-Shapiro waived the entire section 7507.13 issue by forgetting it after it appeared as an affirmative defense in their answer until *after* a request for decision had been made.  (Cf. *Ventura v. ABM Industries Inc.* (2012) 212 Cal.App.4th 258, 265 ["Defendants contend that this cause of action was barred by the doctrine of workers' compensation.  We agree with Ventura that the issue is waived.  It is true that defendants raised the defense in their answer, but we cannot see that they ever asked the court to rule on the issue."].)  A decision based on waiver would add nothing to the legal literature on the topic, and we cannot see why a settlement should be thrown away to make a point about waiver that everyone already knows (or should know).

As to the second criteria, the reasons for the reversal readily outweigh whatever erosion of the public trust comes from reversing the trial court judge.  A corollary of the waiver issue is that the judgment was based on the trial judge's being kept ignorant of the effect of an immunity statute on the case.  That is, it wasn't the *judge's* fault that section 7507.13 might have required a different result.  And of course there is no erosion of confidence in the judiciary when an arguable error in a trial court judgment really isn't the trial judge's fault to begin with.

So we will grant the request for a stipulated reversal as far as First Recovery and Shapiro are concerned.  This also obviates the need to explore whether substantial evidence supports the judgment's inclusion of Shapiro personally.

C. *Marks' Cross-Appeal*

Finally, we come to Marks' cross-appeal.  Marks contends the trial court erred in not including Lasalle's mother Dao in the judgment.  The argument fails.  An element of conversion is that the defendant wrongfully exercised dominion over, or disposed of, the plaintiff's property.  (E.g., *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451-452.)  In this case there was substantial evidence Dao never had possession of the Bentley at all.  It was Lasalle who took the Bentley to a BMW dealer as

12

a trade in. The dealer applied the proceeds of the trade-in to Dao's purchase of a Porsche. Dao was thus out of the Bentley loop. Marks has presented no authority that Dao should be included in the judgment on the theory she was the beneficiary of *proceeds* from the Bentley received by Lasalle and applied to the Porsche, and we decline to look for it for him.[13]

## IV. DISPOSITION

The judgment is affirmed to the degree it makes Lasalle liable to Marks for the value of the converted Bentley. It is reversed to the degree that it makes First Recovery or Shapiro liable at all. It is finally affirmed to the degree it exonerates Dao from liability for the converted Bentley. In the interests of justice and simplicity, each party will bear its own costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

IKOLA, J.

---

[13] The possibility that Lasalle had transferred the proceeds of the Bentley to Dao as part of a fraudulent way of keeping them from Marks as the true owner of the Bentley appears to have worried Lasalle and Dao at trial, but the judge took no notice of it. Even so, to reassure us on appeal, in her response to Marks' cross-appeal, Dao notes it was undisputed that Lasalle had a preexisting debt to her, which was satisfied by the application of the proceeds. On appeal Marks has made no argument that the evidence compels liability on Dao's part for fraudulently receiving property as part of a scheme to hinder a creditor.