[No. A107318. First Dist., Div. Two. Dec. 8, 2004.]

GEORGE HARDISTY et al., Plaintiffs and Appellants, v.
HINTON & ALFERT et al., Defendants and Appellants.

**COUNSEL**

John H. Peterson and George D. Hardisty for Plaintiffs and Appellants.

Long & Levit, Joseph P. McMonigle, Ann L. Strayer and Jessica B. Rudin for Defendants and Appellants.

OPINION

**KLINE, P. J.**—As part of the posttrial settlement of this action, all parties stipulated to vacate the judgment entered in by the Contra Costa Superior Court on May 25, 2004. To effectuate their stipulation, the parties filed in this court an "Application for Order Vacating Judgment"[1] pursuant to Code of Civil Procedure section 128, subdivision (a)(8).[2] The record is not complete and briefing on the noticed appeal and cross-appeal has not commenced.

We shall deny the motion to vacate the judgment.

FACTS

This nonjury case was tried over three days before Contra Costa County Superior Court Judge Joyce Cram. The "Findings of Fact and Judgment after Court Trial" (hereafter findings and judgment) Judge Cram filed on March 25, 2004, may be summed up as follows: Plaintiff George Hardisty, an attorney, referred a client, James Gracey, to attorney and coplaintiff John Peterson. The case related to an automobile accident in 1999 in which Gracey's incompetent brother, Todd Larsen, sustained severe injuries. Acting as guardian ad litem for Larsen, Gracey entered into a written fee agreement with Peterson. The agreement required Peterson to handle the case for a contingent fee of 20 percent and provided that he would share the fee with Hardisty, the referring attorney.

Hulita Kisi, the driver of the van in which Todd Larsen was a passenger, also retained Peterson to represent her. When Kisi was sued by other passengers, another attorney involved in the case moved to disqualify Peterson from representing Larsen based upon the conflict of interest posed by his representation of parties with adverse interests. The motion was granted and Peterson referred the representation of Larsen to the firm of

---

[1] ■ Such requests are ordinarily styled motions for stipulated reversal. We question whether there is any significant difference between the vacating and the reversal of a judgment, as "[t]he effect of an unqualified reversal . . . is to *vacate* the judgment, and to leave the case 'at large' for further proceedings as if it had never been tried, and as if no judgment had ever been rendered. [Citations.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 758, p. 783.) The issue is in any case irrelevant. Section 128, subdivision (a)(8) of the Code of Civil Procedure, which the parties agree is the governing statute, applies to requests to "reverse *or vacate* a duly entered judgment upon an agreement or stipulation of the parties." (Italics added.) Because it makes no difference under the statute whether the court is asked to reverse or vacate the judgment, we shall in this opinion use the terms interchangeably.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Hinton & Alfert, which agreed to substitute as attorneys of record. Hinton & Alfert did not obtain a written fee agreement with Gracey or Larsen.

After Larsen's case settled for $950,000, Hilton & Alfert petitioned for approval of the settlement in the Alameda County Superior Court, where the personal injury case had been filed. At the hearing on the petition, counsel associated with Hinton & Alfert represented to the court that the firm had a written fee agreement providing for a 20 percent contingency fee, and that Peterson was not requesting attorney fees but only reimbursement of his costs. The petition to confirm the compromise of Larsen's claim was granted by the Alameda County Superior Court on August 16, 2002, and Hilton & Alfert was awarded attorney fees of $181,518.22.

Shortly after receiving the attorney fee award, Hinton & Alfert asked Peterson to document the amount of fees he felt entitled to receive in quantum meruit and his costs. Peterson claimed 170 hours at $200 per hour, for a total of $34,000, as well as costs of $4,098.29. However, in addition to these amounts, Peterson also asked Hinton & Alfert to pay Attorney Hardisty the referral fee called for by Peterson's fee agreement. Hinton & Alfert agreed to pay Peterson or Hardisty, but not both, though the firm did reimburse Peterson for his costs. This lawsuit ensued.

The parties' motion states that, by their complaint (which is not now a part of the record), Hardisty and Peterson "alleged that Hinton & Alfert agreed to pay each of them a 'referral fee' in connection with Hinton & Alfert's representation of Todd Larsen, an incompetent adult who was injured in a single-vehicle accident. Messrs. Hardisty and Peterson alleged Hinton & Alfert was contractually obligated to share 1/3 of a 20% contingency fee it collected with them. Hinton & Alfert asserted it was not so obligated."

Judge Cram's findings and judgment included the following determinations: (1) Hinton & Alfert's representations to the Alameda County Superior Court were false, in that the firm had no written fee agreement with its client, and Peterson had requested and been promised reimbursement in quantum meruit for the time he spent on the case prior to the substitution of Hinton & Alfert; (2) Peterson was not entitled to any attorney fees, because "he accepted representation of two parties with adverse interests, and did not have a signed waiver of the conflict"; (3) "Hinton & Alfert is estopped from denying the contract which called for a referral fee to Plaintiff George Hardisty . . . [as] the firm adopted the terms of the contract in their representations to the Alameda County court, and they realized a benefit from

that adoption. Had the Alameda County judge been aware that there was no written contract, Hinton & Alfert would have been [able] to recover only under quantum meruit. The attorneys' fees they actually received as a result of adopting the contract substantially exceeded the fees to which they would have been entitled under quantum meruit";[3] and (4) the contract adopted by Hinton & Alfert "called for a referral fee of 'up to one-third' to Plaintiff George Hardisty . . . [and] this term is sufficiently clear to be enforced. The evidence as to when a lesser referral fee would be given was that this would only happen if there was only a nominal recovery, a situation that did not occur here."

In the judgment, Judge Cram decreed: "1. Plaintiff JOHN H. PETERSON shall take nothing. [¶] 2. Plaintiff GEORGE D. HARDISTY shall recover from Defendant HINTON & ALFERT the sum of $60,506, representing a referral fee of one-third, plus costs of suit. [¶] 3. Defendants PETER HINTON and PETER ALFERT are entitled to judgment in their favor."

The motion to vacate the judgment avers that "Hinton & Alfert objected to the 'Findings of Fact and Judgment' on several grounds including that the court did not comply with [California Rules of Court, rule] 232(e) and had never taken the first procedural step that would have permitted it to request a Statement of Decision. Although Hinton & Alfert did not believe that the 'Findings of Fact and Judgment' was a valid judgment, it appealed from it out

---

[3] In a footnote, Judge Cram noted that "originally, Hinton & Alfert requested that if this court determined that they were entitled only to quantum meruit and not a contingent fee, that this court could calculate the appropriate fee. In post trial briefing, Defendants have instead requested that the Alameda County judge be requested to make that determination. In light of this court's ruling, it is not necessary to reach the issue of which court should decide that issue. However, this court, in order to determine whether Hinton & Alfert benefited from the adoption of the contract, necessarily had to determine the reasonable fees that would have been recoverable under quantum meruit."

Judge Cram's conclusion that the fee awarded Hinton & Alfert exceeded the fee it would have been entitled to receive under quantum meruit was based on findings that the firm "expended a total of 341.9 attorney hours, 66.4 paralegal hours, and 40.3 hours case clerk time. [Citing exhibit No. 20, the petition to approve compromise of Larsen's claim.] The hourly rates claimed by the firm substantially exceed any reasonable rate. In fact, there was no evidence that any client was actually ever billed the claimed rate. Instead, the rates were developed in 2003 (long after the settlement), and apply only to cases where another party may have to pay those fees. The only evidence of a 'reasonable fee' is found in the June 2001 declaration of Peter Hinton in connection with a discovery matter in which he stated that $250 was a reasonable hourly rate. Using that rate for the attorneys, and a similar reduction for paralegal and case clerk rates (reducing the claimed rate by 1/3), would result in a quantum meruit finding of $94,765."

of an abundance of caution.[4] Messrs. Hardisty and Peterson also appealed from the 'Findings of Fact and Judgment.' "[5]

## DISCUSSION

### I.

The parties acknowledge that motions to reverse or vacate duly entered judgments are governed by section 128, subdivision (a)(8). Subdivision (a) enumerates the powers of the courts of this state. Prior to 1999, the last enumerated power, set forth in subdivision (a)(8), simply provided that every court shall have the power "(8) to amend and control its process and orders so as to make them conform to law and justice." Legislation in 1999 added to that sentence the following language: "An appellate court shall not reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties unless the court finds both of the following: [¶] (A) There is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal. [¶] (B) The reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (Stats. 1999, ch. 508, § 1.)

The 1999 amendment was designed to supersede the opinion of the California Supreme Court in *Neary v. Regents of the University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119] (*Neary*). (*Muccianti v. Willow Creek Care Center* (2003) 108 Cal.App.4th 13, 19 [133 Cal.Rptr.2d 1].) *Neary* stood for the proposition that "when the parties to an action agree to settle the their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule." (*Neary*, at p. 284.) The *Neary* rule amounted to a presumption that motions for stipulated reversal should ordinarily be granted. The 1999 amendment reverses *Neary*'s presumption in favor of accepting stipulated reversals and instead creates a presumption against stipulated reversals. (Martin & Shatz,

---

[4] We understand this to mean that Hinton & Alfert's appeal and that of the individual partners, if it proceeds, will argue that Judge Cram was required by California Rules of Court, rule 232(e), to prepare and mail her proposed judgment "to all parties who appeared at the trial within 10 days after expiration of the time for requesting a statement of decision or time of waiver," and that her failure to do so invalidates the findings and judgment she issued on May 25, 2004.

[5] The motion papers do not indicate the theory of the cross-appeal commenced by Hardisty and Peterson who, like appellants, have not filed an opening brief.

*Reverse Course: CCP Section 128(a)(8) Has Succeeded in Reversing the Presumption in Favor of Stipulated Reversals* (Feb. 2003) 25 L.A. Lawyer 24.)

■ In effect, the Legislature adopted Justice Kennard's dissent in *Neary*, and the statute tracks some of the language of her opinion. Fearing that stipulated reversal "undermines judicial efficiency by encouraging parties to try cases rather than settle them," and "erodes public confidence in the judiciary by fostering the perception that litigants having sufficient wealth may buy their way out of the ordinary collateral consequences of public adjudications," Justice Kennard took the position that appellate courts should deny requests for stipulated reversal "if there is a reasonable possibility that the interests of nonparties or the public could be adversely affected by reversal. If there is no reasonable possibility of adverse impact on third parties or the public, then the court should weigh the parties' reasons for requesting stipulated reversal against the other institutional concerns," she emphasized: "the erosion of public trust likely to result from an appearance that the nullification of a judgment can be purchased, and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlements." (*Neary, supra,* 3 Cal.4th at pp. 294–295 (dis. opn. of Kennard, J.).) The approach described by Justice Kennard is the one now mandated by the Legislature. The judicial inquiry is no longer whether "extraordinary circumstances" warrant denial of a request for stipulated reversal, an enterprise not likely to receive much enthusiastic assistance from the parties, but whether the parties have satisfactorily demonstrated that reversal would not adversely affect the interests of nonparties or the public, erode the public trust, or reduce the incentive for pretrial settlement.

## II.

Legislative elimination of the strong presumption in favor of stipulated reversal created a problem the *Neary* court sought to avoid. As Justice Baxter stated in his opinion for the *Neary* majority, "[a] presumption in favor of stipulated reversal to effectuate settlement, rather than a presumption against the procedure, is also more efficient in terms of the resources required of an appellate court. Under a negative presumption, the parties would have the burden of showing that their stipulation should be granted because no countervailing factors are present, e.g., a contrary public interest. Presumably they would have to meet this burden by submitting memoranda of points and authorities and supporting declarations and documentary evidence. Trying to prove a negative, i.e., that there is no reason why the reversal should not be granted, is, of course, difficult. Moreover, the appellate court would have to fully consider these materials. This is largely unnecessary. Under a presumption in favor of granting the parties' request for reversal, the court need not

expend significant resources unless a nonparty comes forward and objects to the settlement for some reason or unless some problem is apparent in the record." (*Neary, supra,* 3 Cal.4th at p. 284.)

■ The burdens on parties and appellate courts *Neary* sought to avoid, or at least minimize, are inescapable under the regime created by the new statute. The parties must now submit memoranda of points and authorities and declarations and other documentary evidence persuasively demonstrating that reversal of the judgment in question will not adversely affect nonparties or the public, erode public trust, or reduce the incentive for pretrial settlement, and the courts must now fully consider and weigh these factors on a case-by-case basis. (*Muccianti v. Willow Creek Care Center, supra,* 108 Cal.App.4th 13, 21; *Union Bank of California v. Braille Inst. of America, Inc.* (2001) 92 Cal.App.4th 1324, 1331 [112 Cal.Rptr.2d 604] (*Union Bank*).)

Moreover, the 1999 amendment compounds a problem (unrelated to the nature of the presumption) that *Neary* overlooked. "Joint requests for stipulated reversal do not arise in the adversarial context American courts take for granted. They are by nature collaborative." (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1994) 22 Cal.App.4th 1814, 1826 [28 Cal.Rptr.2d 498] (conc. opn. of Kline, P. J.), citing Barnett, *Making Decisions Disappear: Depublication and Stipulated Reversal in the California Supreme Court* (1993) 26 Loyola L.A. L.Rev. 1033, 1075.). As commentators have observed, a party-initiated, party-controlled procedural regime such as that applicable to motions for stipulated reversal allows the parties to a dispute "to conspire against the interests of unrepresented future parties and the judicial system." (Zeller, *Avoiding Issue Preclusion by Settlement Conditioned Upon the Vacatur of Entered Judgments* (1987) 96 Yale L.J. 860, 879.) "Absent the adaptation of some forms of continental procedure in which the court and its staff (rather than the litigants) develop information, judges are ill-equipped to do much other than nod when the litigants join together and seek court approval." (Resnik, *Judging Consent* (1987) U.Chi. Legal F. 43, 101.)

Prudent rulings on motions for stipulated reversal have always required information that is usually not in the record or readily apparent. (See 9 Witkin, Cal Procedure, *supra,* Appeal, § 783, pp. 817–818.) The parties ordinarily possess or can obtain such information, but if the information would justify denial of their request for reversal they may not be motivated to seek it or, if they have the information, to disclose it. In 1994, shortly after *Neary* was decided, this appellate district addressed the problem by promulgating local rule 8, which was designed to call the attention of counsel to the nature of the disclosure required of parties seeking stipulated reversal. As amended in 2000 (to call attention to the findings required by the 1999 amendment to section 128), the rule states: "A motion filed in this court for stipulated reversal of a judgment of a trial court must include a joint declaration of counsel that (1) describes the parties and the factual and legal

issues presented at trial; (2) indicates whether the judgment involves important public rights or unfair, illegal or corrupt practices, or torts affecting a significant number of persons, or otherwise affects the public or a significant number of persons not parties to the litigation (if the judgment is against a state licensee, the declaration must also disclose whether it exposes such person to any possible disciplinary proceeding); and (3) discloses whether the judgment sought to be reversed may have collateral estoppel or other effects in potential future litigation and, if so, whether any third parties who might be prejudiced by stipulated reversal of the judgment have received notice of the motion therefor. A copy of the judgment must accompany the motion. [¶] The parties must provide a sufficient showing to support the findings required by Code of Civil Procedure section 128, subdivision (a)(8), as amended effective Jan. 1, 2000." (Ct. App., First Dist., Local Rules, rule 8, Motions for stipulated reversal of judgment.) As recently noted in *Estate of Regli* (2004) 121 Cal.App.4th 878 [17 Cal.Rptr.3d 514], motions for stipulated reversal may be denied for failure to comply with local rule 8. (*Regli*, at p. 881, fn. 2.)

■ Local rule 8 does no more than make explicit a requirement implicit in subdivision (a)(8) of section 128: the duty of counsel for parties to a joint motion for stipulated reversal to affirmatively demonstrate a basis for each of the three findings required to be made by the statute. The absence of a reasonable possibility that the interests of nonparties or the public will be adversely affected by stipulated reversal cannot be demonstrated without a complete description of the legal claims advanced at trial, the rulings on those claims, and the practical consequences of those rulings, if any, for nonparties or the public. The reasons the parties request reversal cannot be shown to outweigh the erosion of public trust that may result from the nullification of a judgment unless the reasons are fully revealed. Finally, the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement cannot be discounted unless it is shown that the parties seriously pursued settlement prior to trial or that the delay in seeking or reaching settlement is explained by a posttrial development that could not reasonably have been anticipated prior to trial.

It is unclear whether the parties were aware of local rule 8, but they clearly have not complied with it nor otherwise made the showings required by the statute.

### III.

To begin with, the page-and-a-half declaration, which consists of little more than an abbreviated description of the procedural history of this case, is not the "joint declaration of counsel" contemplated by our rule, but the declaration only of counsel for Hinton & Alfert—though it is accompanied by

a one-sentence stipulation "to vacate the judgment . . . as part of a settlement of this action" that is executed by counsel for all parties. Nor is the declaration accompanied by a copy of the judgment we are asked to vacate, as also required by local rule 8. Indeed, although the motion and declaration of counsel repeatedly refer to the Judge Cram's findings and judgment, nowhere in either document is there any description of the nature and substance of her findings. We have that information only because the findings and judgment are the subject of the appeal and cross-appeal and were therefore required to be attached to the civil case information statements the parties filed when they initiated appellate proceedings. But though we have Judge Cram's rulings, and can calculate the economic consequences of those rulings for the parties, we cannot determine from the rulings alone whether those are the only consequences, and, as we discuss presently, the nature of some of Judge Cram's findings suggest other possible consequences. Nor do we know the reason or reasons the parties request stipulated reversal, and we are therefore in no position to determine whether, as the parties claim, those reasons outweigh the erosion of public trust that may result from nullification of Judge Cram's judgment. Finally, the parties tell us nothing at all about whether they seriously sought to settle this case prior to trial, or whether an unusual posttrial development created an incentive or need to settle or settlement opportunity that did not previously exist. We are therefore unable to determine whether there is a risk that making stipulated reversal available in this case might reduce the incentive for pretrial settlement.

The parties' contentions that there is no reasonable possibility that the interests of nonparties or the public will be adversely affected by vacating the judgment, and the reasons for requesting vacation outweigh the erosion of public trust that may result from nullification of the judgment, rest heavily on *Union Bank, supra,* 92 Cal.App.4th 1324. The factors that justified stipulated reversal in that case are not, however, present here.

*Union Bank* involved a dispute regarding a testamentary trust. After the beneficiaries appealed two adverse orders, the trustee bank filed a third petition asking the trial court to approve its compensation and for additional instructions. The trial court ordered the parties to mediation, which resulted in a settlement that also encompassed matters germane to the two pending appeals: the appointment of successor cotrustees and modification of the trust. (*Union Bank, supra,* 92 Cal.App.4th at pp. 1326–1327.) Pursuant to the stipulation of the parties, the Court of Appeal reversed the two orders previously appealed. The court found that all three requirements of subdivision (a)(8) of section 128 were satisfied. As to the first requirement, the court found "there is no evidence of any interests on the part of nonparties. The public interest is advanced because disputes resulting in two appeals and one pending probate petition will be resolved without further expense and each of the beneficiaries, which are charities, will no longer be spending moneys in

litigation on these three matters. The beneficiaries will be spending moneys on charitable causes, not legal fees." (*Id.* at p. 1329.) As to the second requirement, the court determined that no erosion of public trust "would arise from a judicially approved reversal of two probate court orders which ultimately serve the interests of the beneficiaries which are charities, the trust, and the public." (*Id.* at pp. 1329–1330.) As the court also noted, the settlement was conducted pursuant to an order of the trial court and all parties had notice of the mediated settlement prior to judicial approval of the settlement terms. Finally, with respect to the third requirement, the court found no evidence that the availability of stipulated reversal would reduce the incentive for pretrial settlement. As the court pointed out, the settlement occurred in conjunction with the resolution of a petition concerning the trustee's fees prior to the time it was set for trial, therefore the settlement calling for stipulated reversal was actually part of a pretrial settlement. (*Id.* at p. 1330.)

The parties rely on *Union Bank* because they believe it stands for the propositions that, as stated in their motion, "the public interest is served by the parties in this action resolving their disputes through a court-ordered mediation," and the public trust "will be promoted, not eroded, by assisting the parties to resolve their disputes" by making stipulated reversal available. The parties ignore that fact that, unlike *Union Bank*, the settlement in this case did not arise out of a settlement proceeding ordered, conducted, or facilitated by a court *prior to trial*. Promoting settlement during the appellate phase of a case has its virtues, but encouraging settlement prior to trial—when it is most salutary, and which the Legislature wanted to encourage—is not among them. Moreover, the idea that stipulated reversal should be made available whenever it would assist parties in resolving their disputes is the very idea repudiated by the 1999 amendment to section 128. If stipulated reversal could be justified by no more than the fact that the settlement was reached in the course of mediation that was judicially facilitated, and because the availability of stipulated reversal will assist settlement—which is what we understand the parties to say—stipulated reversal would be the norm in California, not the exception the Legislature clearly intended.

Finally, the parties gloss over the most salient difference between this case and *Union Bank, supra,* 92 Cal.App.4th 1324. As the opinion in *Union Bank* makes clear, that case did "not involve any allegations of corruption or conduct which would be reportable to licensing and disciplinary agencies." (*Id.* at p. 1329.) Such a statement cannot confidently be made about this case, in which all of the individual parties are state-licensed attorneys, and the professional conduct of some of them was at issue.

As we stated in *Norman I. Krug Real Estate Investments, Inc. v. Praszker, supra,* 22 Cal.App.4th at page 1822, "it would be unconscionable to make it

possible for a [state licensee] who may have acted unethically to purchase disciplinary immunity from one of the consequences of his impropriety." A stipulated reversal that might have that effect would clearly be contrary to the public interest.

We are not asked to determine whether the false representation to a judicial officer or conflict of interest found by the trial court constitutes professional misconduct, and we do not. However, we are asked to find that there is no reasonable possibility that vacating the findings and judgment would adversely affect the interests of nonparties or the public, and that the reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from nullification of the judgment. We cannot make such findings without being satisfied that the conduct of any party found by the trial court would not be reportable to licensing and disciplinary agencies.

■ In essence, the parties ask us to blind ourselves to explicit findings incorporated in the judgment they ask us to vacate, that defendant Hinton & Alfert misled a judge by making a false statement of fact, and that plaintiff John Peterson "accepted representation of two parties with adverse interests, and did not have a signed waiver of the conflict." A false and misleading representation by an attorney to a judge violates the State Bar Rules of Professional Conduct (Rules Prof. Conduct, rule 5-200(B)), as does the representation of adverse interests (*id.*, rule 3-310(C)), and such conduct may be subject to professional discipline. (Bus. & Prof. Code, § 6077.) The parties have failed to sustain their burden of showing that nullification of presumptively correct judicial determinations that some of them engaged in conduct that may expose them to professional discipline would not adversely affect the interests of a person not party to the present action, or the interests of the public, which the Rules of Professional Conduct of the State Bar were designed to protect. (Rules Prof. Conduct, rule 1-100(A).) ■ A judgment should not be vacated if it would deny a licensing agency or the public the ability to discover bad acts involving matters of public concern. (*Muccianti v. Willow Creek Care Center, supra*, 108 Cal.App.4th at pp. 21–22.)

It may be that Judge Cram's findings are unjustified, or that nullification of the judgment would not have the effect of immunizing any party to this case from professional discipline or the legal claims of nonparties; but, as we have been at pains to emphasize, parties who ask for nullification have the responsibility to make such showings, and that has not been done here. The parties make no attempt to show that any of Judge Cram's findings of fact are erroneous, or that the false statements and conflict of interest she found affect only the private interests of one or more of the moving parties, or nonparties who have knowledgeably waived objection, or that disciplinary authorities are already aware of Judge Cram's findings. Nor, finally, do the parties

attempt to persuade us that the findings are manifestly erroneous and judgment would be reversed anyway. (See *In re Rashad H.* (2000) 78 Cal.App.4th 376, 381 [92 Cal.Rptr.2d 723].)

Similarly, because the parties have not explained the reason they seek reversal, they are in effect asking us to ignore the possibility that their purpose is to protect some of them from professional discipline or legal claims from persons who may have been injured by their conduct, reasons that certainly would not outweigh the erosion of public trust that may result from nullification of the judgment. The statutory presumption against stipulated reversal or vacation of judgments bars judicial indifference to such a possibility.

Nor do the parties satisfactorily discount the risk that granting stipulated reversal in this case will reduce the incentive for pretrial settlement. There is no showing that the parties engaged in settlement efforts prior to trial, or of posttrial events that could not have been anticipated prior to trial that either made compromise more imperative than it previously was or rendered it easier to achieve. From all that appears, efforts to settle the parties' fee dispute did not seriously begin until after Judge Cram issued the findings and judgment the parties now ask us to vacate.

## DISPOSITION

For the reasons set forth above, the motion to vacate the findings and judgment of the trial court is denied.

Haerle, J., and Lambden, J., concurred.

On January 4, 2005, the opinion was modified to read as printed above.