[No. B232833. Second Dist., Div. One. May 23, 2012.]

CITY OF PALMDALE et al., Plaintiffs and Respondents, v.
BOARD OF EQUALIZATION, Defendant and Appellant; `
CITY OF POMONA, Real Party in Interest and Appellant.

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
BOARD OF EQUALIZATION, Defendant and Appellant;
CITY OF POMONA, Real Party in Interest and Appellant.

CITY OF ALHAMBRA et al., Plaintiffs and Respondents, v.
BOARD OF EQUALIZATION, Defendant and Appellant;
CITY OF POMONA, Real Party in Interest and Appellant.

COUNSEL

Kamala D. Harris, Attorney General, W. Dean Freeman and Marta L. Smith, Deputy Attorneys General, for Defendant and Appellant.

Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob, Gregory R. Broege; Alvarez-Glasman & Colvin, Arnold M. Glasman and Andrew Jared for Real Party in Interest and Appellant.

Richards, Watson & Gershon and Mitchell E. Abbott for Plaintiffs and Respondents City of Palmdale, Community Redevelopment Agency of the City of Palmdale, City of Beverly Hills, City of Hawthorne, City of La Mirada, La Mirada Redevelopment Agency, City of Norwalk, City of Pasadena, Pasadena Community Development Commission and City of South El Monte.

Carmen A. Trutanich, City Attorney, Beverly A. Cook, Assistant City Attorney, and Pejmon Shemtoob, Deputy City Attorney, for Plaintiff and Respondent City of Los Angeles.

Burke Williams & Sorensen and Richard R. Terzian for Plaintiffs and Respondents City of Alhambra, Alhambra Redevelopment Agency, City of Diamond Bar, City of El Segundo, City of Industry, City of Lancaster, City of Monterey Park, City of West Hollywood and City of Santa Clarita.

## OPINION

**MALLANO, P. J.**—In this appeal from the granting of a petition for a writ of administrative mandate, the parties have filed a motion to settle the case pursuant to a stipulation requiring that we vacate the trial court's judgment and reinstate the agency's decision. We deny the motion for vacatur because the interests of the public would be adversely affected if the judgment were vacated.

In particular, the judgment faults a state agency—which allocates local sales tax revenues among cities and hears taxpayer appeals concerning corporate and personal income taxes—for rendering a decision without due regard for the statutory and constitutional laws that govern its decisionmaking. The agency's decisions affect the fiscal condition of California and its subdivisions and the finances of state taxpayers. To vacate the judgment and reinstate the agency's decision would not only imply the agency acted properly, it would also undermine the effectiveness of the judgment in exposing the agency's deficiencies in handling the administrative appeal. Unless and until reversal on appeal, the judgment should remain intact as a reminder to the agency that it must comply with the laws that restrict its decisionmaking authority.

## I

### BACKGROUND

The pertinent evidence and allegations are taken from the complaint, the exhibits to the motion to vacate the judgment, the parties' stipulated facts, and the underlying record.

As the trial court explained: "California cities and counties are authorized to impose a local sales tax and a local use tax by adopting . . . ordinances. . . . [Local taxes are] administered by the [Board of Equalization (Board)], which collects the local taxes and remits the revenues to participating local jurisdictions. . . .

"Local sales tax revenues are distributed to the place of sale. The place of sale is the city where the retailers have a business location that, under rules and regulations adopted by the [Board], is identified as the place where the sales in question occur. That location, however, does not have to be the same place as the location where title transfers. . . .

"Local sales tax revenues are distributed . . . in one of two ways. About ninety percent of all local tax revenue is distributed directly to *each city* at the end of each tax quarter. The remaining ten percent is distributed to *the cities* indirectly through the pool systems." (Citations omitted, italics added.)

In the motion to vacate the judgment, the parties describe the "warehouse rule" and the pool system: "[T]he so-called 'warehouse rule' [was] used for many years by the [Board] to allocate sales tax revenues among cities, redevelopment agencies, and other local entities in a county. For many years, the [Board] followed a rule providing that sales tax revenues generated by sales from a warehouse were allocated according to *whether the warehouse held its own resale permit*. If the warehouse held such a resale permit, sales were considered to be local and all such sales tax revenues were allocated to *the city or governmental agency* where the warehouse was situated. If the warehouse did not hold such a resale permit (and it was not required to [have one] under past rules) then all sales tax revenues derived from sales from such a warehouse were distributed to *all cities and agencies in the county* (the 'countywide pool')." (Italics added.)

As the trial court stated: "The sales at issue in this case involve transactions where the tangible personal property sold was ordered from an out-of-state retailer but fulfilled from an in-state stock-of-goods belonging to the retailer. Specifically, a retailer of telecommunications hardware maintained a warehouse in [the City of] Pomona. The [retailer] sold products through an 800-number located in Atlanta, Georgia, and merchandise was delivered to the customer from the Pomona warehouse location. [¶] . . .

"Historically, local tax revenue derived from transactions subject to the warehouse rule could only be distributed through the county-wide pool system. [(Cal. Code Regs., tit. 18, former §] 1802(b)(5)[)]. On November 15, 2005 and effective December 16, 2006, the [Board] amended Regulation 1802 to provide that sales tax revenue derived from 'warehouse-rule' sales could be

allocated directly to the location of the warehouse as long as an in-state sales office did not participate in the transactions. [(Cal. Code Regs, tit. 18, §] 1802(c)[)]. Thus, the 2006 amendment changed the method of allocation from a pooled allocation to a direct one.

"[Also in 2006,] the [Board] amended a corollary regulation, Regulation 1699 [(Cal. Code Regs., tit. 18, § 1699)], which interprets and implements the statutes addressing when permits may be issued. Before its amendment, Regulation 1699 did not require a warehouse not customarily visited by customers to purchase goods to obtain a seller's permit. A warehouse was only required to hold a seller's permit if the retailer had no other location in California holding a permit. The rule was changed to require a permit for warehouses at which merchandise is stored and from which retail sales of such merchandise negotiated out-of-state are delivered and fulfilled." (Fn. omitted.)

The Board of Equalization (Board) has described the history of the warehouse rule: "Since the inception of the location tax system in 1956, the Board has concluded that when the retailer had no sales offices in the state (i.e., the sales [were] negotiated out of state) but shipped its goods from a stock of merchandise stored in the state, the location of the warehouse stock was regarded as the place of sale as to all items shipped from that location even if the retailer did not own the warehouse (the 'warehouse rule'). The local sales tax revenue was distributed to that location through the medium of the county-wide pool system. Operative October 1, 1993, the Board amended [California Code of Regulations, title 18, section 1802, former] subdivision (b)(5) to provide that local sales tax revenues derived from sales subject to the warehouse rule should be distributed directly to the location of the stock of goods[, the city or redevelopment agency,] rather than through the county-wide pool system [to all cities and redevelopment agencies in the county]. The amendment did not address what happened when the retailer did have sales offices in this state in addition to the stocks of goods. [¶] . . . [¶]

"On August 31, 2005, the Board concluded that it should be clarified that local sales tax revenue derived from sales subject to the warehouse rule should be distributed to the location of the stock of goods from which delivery is made in all cases[, namely, to the city or redevelopment agency where the warehouse is found]. The Board has also concluded that placing the regulatory provisions governing such sales in [California Code of Regulations, title 18, section 1802,] subdivision (b), which generally addressed the issue of sales negotiated in this [state] by specified types of sellers, caused confusion as to the basis for asserting local sales tax on sales subject to the warehouse rule. In that [situation], the participating jurisdiction where the stock[] of goods is located asserts its jurisdiction based not on where the sales were negotiated but

on the fact that the retailer's property is located in the jurisdiction. As a result, the Board concluded that [California Code of Regulations, title 18, section 1802, former] subdivision (b)(5) should be deleted and its current language moved to a new subdivision to which is added language providing for direct allocation [to the city or redevelopment agency] when the retailer has sales offices located in state in addition to the stock of goods." (Initial Statement of Reasons <http://www.boe.ca.gov/regs/pdf/1802InitalStatementofReasons.pdf> [as of May 23, 2012].)

The new subdivision, California Code of Regulations, title 18, section 1802, subdivision (c), states: "(1) If an out-of-state retailer does not have a permanent place of business in this state other than a stock of tangible personal property, the place of sale is the city, county, or city and county from which delivery or shipment is made. Local tax collected by the Board for such sales will be distributed to that city, county, or city and county. [¶] (2) If a retailer has a permanent place of business in this state in addition to its stocks of tangible personal property, the place of sale, in cases where the sale is negotiated out-of-state and there is no participation by the retailer's permanent place of business in this state, is the city, county, or city and county from which delivery or shipment is made. Local tax collected by the Board for such sales will be distributed to the city, county, or city and county from which delivery or shipment is made."

Before the 2006 amendments, the Board had pooled the local sales taxes generated by the 800 number located in Atlanta—the telecommunications hardware retailer—and allocated those tax revenues to *all* cities, redevelopment agencies, and other governmental entities in Los Angeles County, including Pomona. From July 1, 1993, to December 31, 2007, the retailer paid local sales taxes, which were distributed through the countywide pool, in the amount of $9,657,000.

In June 1994, Pomona petitioned the Board to reallocate a portion of the retailer's local sales tax revenues, requesting a significant increase in Pomona's share of the taxes. On September 21, 1999, a "local tax hearing advocate" issued a "Decision and Recommendation," denying the petition on the ground that *the retailer had multiple California sales offices with permits, but the Pomona warehouse lacked a permit*. Consequently, " 'any local sales tax due on the deliveries made pursuant to orders from the out-of-state 1-800 order desk should be allocated [to *all* cities and redevelopment agencies] through the countywide pool.' " (Italics added.) Pomona appealed that decision to the next level, "Board Management," which denied the appeal by written decision on July 24, 2000.

In the late 1990's and early 2000's, an appeal from Board Management to the Board was governed by the 1996 "Process for Questioning Local Tax

Allocations," which created a multistep administrative system of review. The process was revised in October 1998. Neither the original appeal process nor the revision complied with the Administrative Procedure Act (Gov. Code, §§ 11340–11529). In February 2003, the Board adopted a regulation setting forth the process for pursuing an administrative appeal of local sales tax allocations (Cal. Code Regs., tit. 18, § 1807). The 2003 regulation, adopted in accordance with the Administrative Procedure Act, incorporated much, but not all, of the 1996 review process as amended in 1998. Under the new regulation, a petition seeking to reallocate local sales tax revenues is initially reviewed by the "Sales and Use Tax Department" (Cal. Code Regs., tit. 18, § 1807, subd. (b)), then by the "Appeals Division" (*id.*, subd. (c)), and, finally, by the Board (*id.*, subd. (d)).

On September 9, 2008, almost two years after the 2006 amendment of California Code of Regulations, title 18, section 1802, which governs the reallocation of local sales tax revenues, Pomona requested that the Board review the July 24, 2000 denial of its reallocation petition by Board Management. The Board's staff had already informed Pomona that the Board Management decision was " 'not subject to correction' " under the 2006 amendments to California Code of Regulations, title 18, sections 1699 and 1802 because the decision had become final.

On December 17, 2008, the Board—over the objections of its chief counsel and staff attorneys—granted Pomona's request for a hearing. On or about May 11, 2009, the affected cities in Los Angeles County were notified of the nature of the upcoming hearing.

On August 31, 2009, the Board conducted the first of two public hearings on Pomona's petition for reallocation. At the second hearing, on December 15, 2009, the Board voted to grant the petition in part, ordering the Los Angeles County tax pool to reallocate $7,139,097 to Pomona. The Board "concluded that there was no misallocation of local [sales] tax from July 1, 1993, through September 30, 1993, but that for the period from October 1, 1993, through December 31, 2007, local sales tax of $9,518,798 allocated through [the] Los Angeles countywide pool, from sales negotiated outside California and delivered from the Pomona warehouse location, without participation by any other California location of the retailer, should have been allocated directly to Pomona." Based in part on additional factors—Pomona's agreement to a 25 percent reduction in what it was owed and the date on which the Board first obtained knowledge of the improper distribution (see Rev. & Tax. Code, § 7209)—the Board ordered that $7,139,097 be reallocated to Pomona.

On January 15, 2010, the Board gave written notice to all interested parties of its December 15, 2009 decision, indicating that the decision was final and Pomona had exhausted all administrative remedies.

On February 16, 2010, seven cities and three redevelopment agencies filed a petition against the Board, seeking a writ of administrative mandate to overturn the Board's January 15, 2010 decision (*City of Palmdale v. State Board of Equalization* (Super. Ct. L.A. County, 2011, No. BS124919)).[1] On the same day, a similar petition was filed by the City of Los Angeles (*City of Los Angeles v. State Board of Equalization* (Super. Ct. L.A. County, 2011, No. BS124950)). On February 19, 2010, eight cities and one redevelopment agency filed a third petition against the Board (*City of Alhambra v. State Board of Equalization* (Super. Ct. L.A. County, 2011, No. BS124978)).[2] (For clarity, we will refer to those cities and redevelopment agencies collectively as "plaintiff cities.") Each of the three petitions listed Pomona as the real party in interest.

On April 8, 2010, the trial court, Judge David P. Yaffe presiding, ordered that the three petitions be consolidated for all purposes and that the Board's January 15, 2010 decision be stayed. Plaintiff cities filed memoranda supporting the petition. The Board and Pomona filed memoranda in opposition. On February 16, 2011, the trial court, Judge Ann I. Jones presiding, heard argument on the petition, granted it in part, and issued a written ruling. The trial court deemed the written ruling to be its statement of decision, which was incorporated into the judgment, filed on March 9, 2011. On March 11, 2011, the trial court issued a peremptory writ of mandate, commanding the Board to set aside its January 15, 2010 decision, to take no further action to enforce or implement the decision, and to conduct further proceedings consistent with the trial court's statement of decision.

Thereafter, plaintiff cities moved for an award of attorney fees in the trial court. (See Code Civ. Proc., § 1021.5.) The motion was denied.

The Board and Pomona separately appealed from the judgment. We consolidated the appeals.

---

[1] In addition to Palmdale, the other plaintiffs were the Community Redevelopment Agency of the City of Palmdale, the City of Beverly Hills, the City of Hawthorne, the City of La Mirada, the La Mirada Redevelopment Agency, the City of Norwalk, the City of Pasadena, the Pasadena Community Development Commission, and the City of South El Monte.

[2] In addition to Alhambra, the remaining plaintiffs were the Alhambra Redevelopment Agency, the City of Diamond Bar, the City of El Segundo, the City of Industry, the City of Lancaster, the City of Monterey Park, the City of West Hollywood, and the City of Santa Clarita.

The record on appeal has been filed, which covers the trial court proceedings and the administrative appeals. The opening brief in this court is not yet due.

All parties in the case—the 20 plaintiff cities, Pomona (real party in interest), and the Board (defendant)—brought the pending motion to vacate the judgment. Under the parties' "Stipulation for Order Vacating Judgment Upon Settlement," the judgment of the trial court would be vacated, the peremptory writ of mandate would be recalled, and the action would be dismissed with prejudice. Each party would bear its own attorney fees and costs. Under a separate "Settlement Agreement" between Pomona and each plaintiff city, the Board's January 15, 2010 decision would be reinstated, the Board would pay Pomona in accordance with that decision, and Pomona, in turn, would reimburse each plaintiff city in an amount to which Pomona and the city previously agreed.

In the motion, the parties pay scant attention to what the trial court decided, stating only, "The primary issue in this appeal will be whether the trial court correctly determined that the [Board] proceeding was quasi-judicial in nature—requiring a resolution setting forth findings and conclusions . . . ."

Instead of focusing on the effect of vacating the judgment, the motion is devoted almost exclusively to the *monetary* benefits of the settlement, including (1) "[t]he net effect of this settlement will be that the City of Pomona will voluntarily reimburse approximately 51% of the reallocation ordered by the [Board]"; (2) the City of Los Angeles, the largest beneficiary of the settlement, will recover $2,087,880; (3) the entire amount in controversy, or a large percentage of it, could be "consumed" by legal fees and costs if the case does not settle; (4) plaintiff cities have already spent in excess of $500,000 on legal fees; (5) in general, cities serve the public, such that the settlement proceeds would assist plaintiff cities in providing police and fire protection, libraries, public parks, and a "host" of other public services in an era of dire financial circumstances; (6) after two and one-half years of "administrative wrangling," the parties are "nowhere near a resolution of this dispute" on the merits; (7) absent settlement, the parties face protracted litigation—further administrative proceedings, then another writ petition and possible appeal; and (8) the present appeal involves one of the last of several disputes before the Board regarding the revision of the warehouse rule.

## II

## DISCUSSION

By statute, "[a]n appellate court shall not reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties unless the court finds *both* of the following: [¶] (A) There is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal. [¶] (B) The reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (Code Civ. Proc., § 128, subd. (a)(8)(A), (B), italics added.)

■ This statute was amended in 1999. "The 1999 amendment was designed to supersede the opinion of the California Supreme Court in *Neary v. Regents of the University of California* (1992) 3 Cal.4th 273 [10 Cal.Rptr.2d 859, 834 P.2d 119] (*Neary*). . . . *Neary* stood for the proposition that 'when the parties to an action agree to settle . . . their dispute and as part of their settlement stipulate to a reversal of the trial court judgment, the Court of Appeal should grant their request for the stipulated reversal absent a showing of extraordinary circumstances that warrant an exception to this general rule.' . . . The *Neary* rule amounted to a presumption that motions for stipulated reversal should ordinarily be granted. The 1999 amendment reverses *Neary*'s presumption in favor of accepting stipulated reversals and instead creates a presumption against stipulated reversals." (*Hardisty v. Hinton & Alfert* (2004) 124 Cal.App.4th 999, 1005 [21 Cal.Rptr.3d 835], citations omitted.)

■ In ruling on a motion to vacate a judgment, we first determine whether there is a "reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal." (Code Civ. Proc., § 128, subd. (a)(8)(A).) That inquiry requires that we review the specifics and nature of the trial court's decision—an analysis not provided by the parties. (See *Hardisty v. Hinton & Alfert, supra*, 124 Cal.App.4th at p. 1007.) Based on our analysis, we conclude the interests of the public would be adversely affected if the judgment were vacated and therefore deny the motion.

As relevant here, the Board acts as the final administrative decision maker in appeals involving sales and use taxes. It also reviews the decisions of the Franchise Tax Board (FTB) concerning the payment of corporate and personal income taxes. The Board consists of five members, four of whom are publicly elected by geographical districts, and the fifth, the State Controller, who is chosen in a statewide public election and serves ex officio.

The trial court addressed five major issues in its statement of decision, which became part of the judgment.

First, the trial court concluded that the Board's January 15, 2010 decision, granting Pomona's reallocation petition in part, was a quasi-judicial ruling governed by section 1094.5 of the Code of Civil Procedure. Thus, the court reasoned, the Board's decision had to set forth express findings and a discussion of the evidence supporting them. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–516 [113 Cal.Rptr. 836, 522 P.2d 12].) An agency's findings and description of the supporting evidence are intended to minimize the likelihood that the agency will "randomly leap from evidence to conclusions" (*id.* at p. 516) and to facilitate judicial review of the agency's decision (*id.* at pp. 516–517).

Here, the trial court found that the Board's decision "does not even hint at the reasons for the decision and does nothing more than compute the amount of sales tax revenue to be reallocated." As a result, the trial court was "forced into unguided and resource-consuming explorations; it [had] to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate . . . decision of the agency." (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra*, 11 Cal.3d at p. 516.)

Second, although the lack of a reasoned Board decision made judicial review difficult, the trial court observed that the Board may have *retroactively* applied the 2006 amendments to the warehouse rule even though it lacked the legislative authority to do so. The Board maintained it had clear legislative authority to apply its regulations retroactively. But senior tax counsel for the Board advised that there was " 'no authority for granting this retroactively.' "

Third, the trial court opined that the Board may have violated due process by "reallocat[ing] substantial tax revenues that had already been received and spent by the affected cities." Plaintiff cities "had a present, vested right to those funds, which were thereafter included in and spent as part of each city's annual budget. Yet, the [Board] declared that those funds should be reallocated and redistributed to Pomona. And, [it] did so without any explanation as to how that order would pass Constitutional muster . . . ." The case law cited by the Board in the trial court did not address the due process question raised here: whether public entities can be deprived of *past* tax revenues without due process. It was undisputed that plaintiff cities had no notice of Pomona's challenge to the tax allocations until 2008, notwithstanding that Pomona's initial petition seeking a reallocation was filed in June 1994, the initial petition was denied by a local tax hearing advocate in 1999, and the subsequent appeal was rejected by Board Management in 2000. As one

member of the Board put it in 2008, " 'I think we have the duty to consider the facts of the case and ignore arguments made about due process and procedures.' "

Fourth, the trial court concluded that the doctrine of laches precluded the Board from considering Pomona's September 2008 appeal of the Board Management decision rendered in July 2000. Again, in deciding to hear the appeal, the Board ignored the advice of its staff, which had recommended that a six-month appeal period be applied and that Pomona's delay of nearly eight years had been "unreasonable." As the trial court explained: "[T]he doctrine of laches is clearly applicable for cases such as this one, where there is substantial and unjustified delay, yet there is no statutory limitation imposed upon the action. . . . [A]t some point, there must be finality to a reimbursement program or otherwise there can be no resource planning by the recipients. The same kind of prejudice exists in this case. The affected cities received those monies and made budgetary decisions dependent upon that revenue years ago. Having monies reallocated at this late date will cause a severe financial hardship."

Fifth, the trial court noted that certain provisions of the administrative process under which the Board considered Pomona's appeal—the 1996 Process for Questioning Local Tax Allocations, as revised in 1998 —were not adopted under the Administrative Procedure Act, possibly rendering the Board's decision invalid. The court instructed the Board to ascertain which parts of the 2003 regulation complied with the act and to use only those provisions in deciding Pomona's appeal.

The trial court ordered the Board to set aside its January 15, 2010 decision and to reconsider the matter in light of the trial court's decision.

Thus, in the trial court's view, the Board demonstrated a lack of knowledge of basic statutory and constitutional rights that inure to the benefit of the public in two distinct ways.

First, the Board's duties extend to resolving numerous tax disputes, including local sales tax reallocations and appeals of FTB decisions regarding corporate and personal income taxes. The Board is an administrative agency of high importance with vast power over the purse strings of California cities and taxpayers. As recited in the judgment, the Board (1) failed to understand that it must explain the basis of its decisions; (2) paid little attention to its statutory authority, or lack thereof, to apply regulations retroactively; (3) appeared unconcerned with the principles of due process; (4) was oblivious to the inequities of considering an appeal filed eight years after the Board Management decision; and (5) ignored the requirements of the Administrative Procedure Act.

The trial court's judgment is tantamount to a public reproval and is an embarrassment to an agency charged with functions vital to the financial stability of California and its subdivisions and the finances of state taxpayers. The judgment provides a strong practical incentive for the Board to consider, in the future, the laws that govern the way it operates in deciding *any* tax appeal. We reject the parties' contention that this case is merely "a dispute over money." *All* of the appeals before the Board could be characterized in that manner. This appeal deserves particular attention because, according to the judgment, the Board displayed a repeated lack of concern for the statutory and constitutional procedures that restrict its decisionmaking authority. If the Board ignores applicable legal principles, an erroneous decision is more likely. Unless and until the judgment is reversed on appeal, it should remain on the books to encourage the Board to comply with the laws governing the tax appeals within its jurisdiction, including local sales tax reallocations as well as the payment of corporate and personal income taxes.

Second, the residents of California have a significant interest in how the Board reallocates local sales tax revenues. Today, all cities in the state are in need of funds to provide adequate police and fire protection, libraries, public parks, and other public services. For example, the City of Los Angeles stands to lose $2.32 million in tax revenues under the Board's decision. Cities and their residents—the public—have a right to know *why* a city is losing or gaining millions in local sales tax revenues, that is, a right to know the Board's grounds for reallocating those taxes. Just as one city may receive millions in reallocated local sales tax revenues, another may lose them. The Board's decision directly affects the public—the residents of plaintiff cities—in terms of the type and level of services the cities can provide. To vacate the judgment and reinstate the Board's decision would not only imply the Board made the correct decision, it would also undermine the effectiveness of the judgment in exposing the Board's deficiencies in deciding to reallocate local sales tax revenues.

■ Under the settlement, the Board would be dismissed with prejudice and would neither pay nor receive any damages. The Board would undoubtedly benefit if the judgment were vacated, especially in light of the trial court's findings about the Board's questionable decisionmaking process. Nevertheless, under the law, those very deficiencies preclude us—given the public importance of the subject matter—from vacating the judgment pursuant to the parties' stipulation.

Because of our conclusion that the granting of the motion to vacate the judgment would have a reasonable possibility of adversely affecting the interests of the public (see Code Civ. Proc., § 128, subd. (a)(8)(A)), we need not address any other factors set forth in section 128, subdivision (a)(8) of the Code of Civil Procedure.

## III

## DISPOSITION

The motion is denied.

Chaney, J., and Johnson, J., concurred.